#### OF THE

# STATE OF NEVADA

## JANUARY TERM, 1911

[No. 1901]

IN THE MATTER OF THE APPLICATION FOR THE DIS-
BARMENT OF WILLIAM H. SCHNITZER.

1. ATTORNEY AND CLIENT—SUSPENSION AND DISBARMENT—UNPRO-
FESSIONAL CONDUCT—"MISCONDUCT."
    For an attorney to publish and advertise a pamphlet, the
    purpose of which is to attract nonresidents to the state to
    apply to its courts for divorce, through his agency as an attor-
    ney, that he may profit financially thereby, is "misconduct,"
    within Comp. Laws, 2625, providing for removal or suspension
    of attorneys for misconduct.

2. ATTORNEY AND CLIENT—UNPROFESSIONAL CONDUCT—PUNISHMENT.
    An attorney who published and advertised a pamphlet to
    attract nonresidents to the state to apply for divorce through
    him will be shown leniency, and suspended for only eight
    months, and till the further order of the court; he having dis-
    continued the advertising when his attention was called to his
    methods being condemned by the bar association of the city,
    and his being the first case of the character brought to the
    attention of the court.

ORIGINAL PROCEEDING. In the matter of the applica-
tion for the disbarment of William H. Schnitzer as an
attorney at law. **Respondent suspended.**

### STATEMENT OF FACTS

The respondent, William H. Schnitzer, was admitted to
practice in all the courts of this state upon the 18th day

of January, 1907, upon motion based upon a license to practice in the courts of the State of New York and upon a showing of good moral character. Respondent filed a demurrer to the petition filed by the Reno Bar Association, praying for his disbarment, which was overruled, whereupon he interposed an answer. The main facts upon which the petition is based are not denied, but certain allegations in the petition, based upon such facts, are denied.

The following are the principal facts upon which the proceeding is based:

Prior to the institution of these proceedings, the respondent caused to be published in the programs of the Orpheum Theater of San Francisco advertisements reading as follows:

DIVORCE LAWS OF NEVADA.
Have you domestic troubles,
Are you seeking DIVORCE
Do you want quick and reliable action?
Send for my booklet
Contains Complete Information FREE
Shortest Residence
Address
Counsellor, P. O. Box 263, Reno, Nevada.
Correspondence Strictly Confidential.

DIVORCE LAWS OF NEVADA.
Send for my booklet
Contains information FREE
Address:
Counsellor, P. O. Box 263, Reno, Nevada.
(W. Shafer)
Correspondence Strictly Confidential.

DIVORCE LAWS OF NEVADA
Have you Domestic Troubles
Are you seeking DIVORCE
Do you want quick and reliable action?
SEND FOR MY BOOKLET
Contains Complete Information FREE
Shortest Residence
Address
W. H. SCHNITZER
Counsellor, P. O. Box 263, Reno, Nevada,
Correspondence Strictly Confidential.

Upon certain days during the month of April, 1909, the respondent caused to be inserted in the Brooklyn Daily Eagle of Brooklyn, N. Y, and in the Washington Post of Washington, D. C., newspapers of large circulation, the following advertisement: "Divorce Laws of Nevada. Complete Information Mailed Free by Attorney William K. Shafer, Reno, Nevada." The "W. Shafer" and the "William K. Shafer" mentioned in the foregoing advertisements was intended for a certain William B. Shafer, who for a time was in the office of the respondent, but who was not an attorney of this court.

In January, 1909, the respondent published a twenty-four-page pamphlet for general distribution, the title-page of which reads:

DIVORCE  PRACTICE  AND  PROCEDURE.
Under the Laws of the State
of Nevada, with Notes
and Decisions.
Compiled and Digested by
WILLIAM  H. SCHNITZER
of the Nevada Bar.
Published at Reno, Nevada,
January, 1909.

The preface to the pamphlet reads:

"Preface.

"The purpose of this treatise is to briefly, tersely, concisely, and clearly present to the reader the divorce practice and procedure under the laws of the State of Nevada.

"While the laws of the eastern and middle west States generally, contain some provision for the dissolution of the marriage tie, it is obvious to the reader that in cases where extreme cruelty, desertion and neglect to provide form the basis of the grievance, the law in such States offers no substantial relief to the aggrieved party, because the requirements of proof, duration of offense, corroboration of plaintiff, and procedure under court rules are so exacting and irksome, that the desired relief sought by applicant is rendered impossible of attainment.

"Summing up the situation, as it exists in the eastern

States, respecting the domestic relation law, the client when consulting local counsel, is almost invariably advised that upon the facts submitted he or she is without remedy.

"Here in Nevada, the applicant, without deception or fraud, upon almost any charge, from which lack of harmonious relations may be reasonably inferred, may apply to our courts and secure prompt results, by decree of absolute divorce, valid and binding in law. The next few pages will contain the statutes of Nevada applicable together with a brief interpretation, supported by Supreme Court decisions, clearly indicating the superior advantages afforded applicant under the law and procedure of Nevada.            William H. Schnitzer."

The pamphlet is divided into subjects under the following headlines: "Divorce Statutes." "Causes." "Cruelty as Interpreted by Judicial Decisions." "Residence." "Summons and Service; How made upon Defendant." "Service of Non-Resident by Publication." "Appearance of Defendant." "Testimony and Hearings Before the Court." "Alimony and Custody and Support of Children." "Decree of Divorce Shall Provide." "The City of Reno, Nevada." "Summary." "Your Selection of Lawyer." "My References."

Without setting forth a copy of the pamphlet in full, the following extracts will serve to show its general import:

"Residence.

"Under the provisions of section 22 of the Marriage and Divorce Act, the plaintiff must reside in the State for a period of at least six months. This is not construed to mean that in order to fully comply with the statute, party must remain here continuously for said period. So, if a party comes to Nevada, and in good faith takes up a residence, party may leave the State at any time after establishing residence, may go and travel when and wherever party chooses and may return to the State whenever inclination prompts, and yet, such temporary absence would not in anywise affect the legality of the

residence established, but party would be entitled, under the law, to bring suit, any time after the lapse of six months from the date residence was originally established, notwithstanding party's absence from the State during said period.

"Upon a careful reading of section 22 (page 5) the reader will note several exceptions to the rule requiring a residence in the State of six months, viz.: *In any case where the defendant may be found, or may reside within the State.*  The residence of the plaintiff is immaterial, and it is not necessary to prove any period of residence on the part of plaintiff; so, in cases where defendant is willing to facilitate the plaintiff, and will come to Nevada and remain here long enough to enable plaintiff to procure the service of the summons on defendant personally, within the State, then in that case, suit may be filed at once regardless of the duration of plaintiff's residence here, and under such circumstances the court will acquire complete jurisdiction."

"Appearance of Defendant.

"A defendant shall be deemed to appear in an action when he answers, demurs or gives the plaintiff or her attorneys written notice of his appearance, or when an attorney gives notice of appearance for him.

"Compiled Laws of Nevada, section 3594.

"A voluntary appearance of defendant shall be equivalent to personal service of summons upon him.

"Compiled Laws of Nevada, section 3130.

"In many cases the voluntary appearance of defendant may be procured, thereby saving the time and avoiding the tedious delays incident to service of process and proofs of service.  To that end I am in position to recommend to my clients, the names of reputable attorneys in the State, who, upon written instructions from defendant will enter an appearance in his or her behalf, which practice is frequently resorted to for the purpose of bringing the main issue speedily before the court."

"Testimony and Hearings before the Court.

"After the completion of the service of the Summons

upon the defendant as herein set forth, and his time to appear for answer has expired, the plaintiff may at once proceed with hearing before the court. Our courts are always in session to hear testimony in uncontested divorce proceedings, and the hearing can be set for any day, on motion of counsel. In all such cases where there is no real contest, the oral testimony of plaintiff, without corroborative testimony, (usually required in other States) before the Judge, in *private chambers*, in support of the allegations of the Complaint is deemed sufficient.

"This rule of practice is in line with the provisions of section 26 of the Domestic Relation Act, Laws of Nevada."

"The City of Reno, Nevada.

"Important questions that will appeal to many, before deciding to leave their present domicile, and coming to this Western country are: What sort of a place is Nevada with respect to climate, comfort and convenience of life and opportunity of engaging in business, or securing lucrative employment?

"To fully cover this ground and to do justice to the grandeur and industrial enterprises of this great-*greatest*-mineral State, would alone require a volume. I will only reply briefly and tersely to these interrogatories, and for further and more complete information on the subject will be pleased to reply by letter to special inquiry.

"Reno, the commercial metropolis of Nevada, is beautifully situated on the Truckee River, at an elevation of 4495 feet above sea level, and is on the main line of the Southern Pacific Railroad, overlooking the majestic Sierra Nevada Mountains, and is just 26 miles easterly from the borders of California; just two hours ride from Lake Tahoe, the most beautiful and picturesque lake in America, and the mecca of society and fashion; the climate is dry, healthy and invigorating; is especially favorable to the treatment of bronchial and pulmonary troubles; there are no sudden extremes of heat and cold.

"Reno is the seat of the State University, has public library, seven churches of all religious denominations, five banks with combined deposits of over six million dol-

lars, three theatres, four modern up-to-date fire-proof hotels, six and half miles of street railway, operated through the leading streets, beautiful public and office buildings, and magnificent homes.

"The cost of living in Nevada, all things being considered, is as low as any part of the country, and employment in all branches of labor is readily obtained at good wages. Steady and industrious mechanics should experience no difficulty in securing employment at a high rate of wages."

"Summary.

"Summarizing all that has been herein submitted to the reader, and as sound reasons why the greatest advantages and facilities are afforded under the law and practice of Nevada, to those seeking speedy release from the marital relations we submit as follows:

"1. The shortest period of residence, viz. six months.

"2. In special instances, when defendant may be found in the State, suit may be filed at once without a delay of six months.

"3. The great number of grounds, viz. seven distinct and separate grounds.

"4. The simplest and least difficult grounds to prove: (Reading carefully citations under subdivision of 'Cruelty').

"5. No delays after time for defendant to answer has expired, our courts being always in session to hear testimony in uncontested cases.

"6. Under the charge of Extreme Cruelty plaintiff may allege and prove any facts or acts producing mental anguish and *threatening* health.

"7. Under the practice of our courts, where no real contests exists, parties are not subjected to embarrassing cross examinations.

"8. In all uncontested cases parties may, on application of counsel, have hearings conducted in private chambers of the Judge and thereby avoid embarrassing publicity and exposure to the public.

"9. Unlike the practice and rule in most states, the

sole testimony of plaintiff, without corroborative proofs, is sufficient to establish the allegations of the complaint in all undefended actions.

"10. A decree absolute is granted immediately, after proofs are submitted, so that party receiving same may marry again at once, and is not obliged to wait for any period thereafter as is the law in many States.

"11. Here in Nevada, we have up-to-date Cities where one may enjoy all the comforts, conveniences and luxuries of an eastern metropolis, and may indulge in little journeys into the adjoining State, California, which is justly styled the land of 'Sunshine and Flowers.'"

"Your Selection of a Lawyer.

"Lastly, but most importantly, is the question for you to determine: Who shall I select as my attorney to conduct my proceedings? Naturally you want the best, the most skillful and reliable talent obtainable, one in whose judgment and advice you will place implicit confidence before you incur the expense and time in traveling to this State to establish your new residence.

"It may sound somewhat boastful to shout my own praise, but under the circumstances it is necessary that I tell you frankly who I am, and how I stand in this community.

"The writer has had twenty years experience in the actual practice of the law at the New York and Nevada Bar. I pride myself in being able to state, with perfect frankness and candor, that during the three years of active practice at the Nevada bar I have earned and won the friendship, respect and esteem of my colleagues at the bar and the Judges on the Bench.

"I have made it a rule of my conduct to always make my word good and deal on the square with everybody. I am a member of the executive committee of the State democratic organization.

"A sense of modesty impels the writer to refrain from further self-aggrandizement; but with the consciousness of my own record in this Commonwealth, and with a full realization that those who know me will be willing to say

a kind word for me and will testify to my good reputa-
tion and high standing, I unhesitatingly submit to the
inquirer a few of my references."

Under the heading of "My References," the respondent
appends the names of judges, a United States senator,
the acting governor of the state, attorneys, editors, and
prominent business men of the state, at least one of
whom is shown to have repudiated the use of his name
in such manner.

The concluding page of the pamphlet reads as follows:

WILLIAM  H.  SCHNITZER,
Attorney and Counsellor-at-Law,
Rooms 10, 11, 12 and 13,
Gazette Building,
Reno, Nevada.
Branch Offices:
Goldfield, Nevada,
Carson City, Nevada,
Tonopah, Nevada,
Rawhide, Nevada.
Commercial and Mining Practice and Litigation in all
State and Federal Courts.
Depositions carefully taken.　Correspondence in Refer-
ence to Financial Standing of Parties will
receive prompt attention.
For references see page 18.
Twenty years active experience in commercial litigation
and practice.

*Sylvester S. Downer, Chas. R. Lewers, James T. Boyd,
W. A. Massey,* and *Cole L. Harwood,* for Petitioner.

*Platt & Gibbons,* for Respondent.

*Per Curiam:*

That the purpose of the pamphlet, published by respond-
ent, was to attract persons, residing outside the State of
Nevada, and citizens of other states and counties, to come
to this state for the ultimate purpose of applying to its
courts for divorce, through the agency of the respondent
as an attorney, in order that he might profit financially
thereby, is too manifest to require other than the bare

statement. That the object of the advertisements quoted was to extend the circulation of the pamphlet is equally obvious. This method of advertising is highly reprehensible and contrary to the ethics of the legal profession, as universally recognized. Even if statements contained in the pamphlet were not open to question, either as to fact or law, nevertheless, the purpose for which the pamphlet was issued and the advertisements published merits a severe rebuke.

The pamphlet, however, contains statements that, to say the least, are misleading. It is not true that the laws of this state permit a divorce "upon almost any· charge from which lack of harmonious relations may be reasonably inferred." It is not true that the testimony of the plaintiff in a divorce case whether or not there be a "real contest" can be heard "before the judge in private chambers." The testimony in divorce proceedings must be before the court. An action for the dissolution of the bonds of matrimony, whether contested or not, is not a proceeding that a judge can hear in chambers. Even if we were to accept the explanation of respondent that he only intended to convey the information that in uncontested cases the court could hold sessions in the private chambers of the judge, nevertheless, that would not be the meaning which the layman would naturally place upon the language used.

Petitioners have attacked the correctness of a number of statements contained in respondent's pamphlet as to the law of this state upon the subject of divorce; but we do not deem it essential in this proceeding to determine these questions. It would be sufficient to rest our condemnation of the conduct of the respondent upon the pamphlet and advertisements upon a bare recital of the same without comment. They speak for themselves and are unworthy the high calling that respondent has followed, as he says, for twenty years. The courts of Nevada were established and are maintained for the protection of her citizens and citizens of other states and countries having dealings with the citizens of this state.

An attorney who, for purposes of personal gain, seeks to make the courts of this state a clearing house for the domestic woes, real or imaginary, of the country at large, is certainly guilty of misconduct. (Comp. Laws, 2625; *People* v. *MacCabe*, 18 Colo. 186, 32 Pac. 280, 19 L. R. A. 231, 36 Am. St. Rep. 270; *People* v. *Taylor*, 32 Colo. 250, 75 Pac. 914; *Ingersoll* v. *Coal Creek Coal Co.*, 117 Tenn. 263, 98 S. W. 178, 9 L. R. A. (N. S.) 282, 295, 119 Am. St. Rep. 1003; *People* v. *Goodrich*, 79 Ill. 148; 4 Cyc. 911.)

In *People* v. *MacCabe*, *supra*, the Supreme Court of Colorado, by Mr. Justice Elliott, said:

"The ethics of the legal profession forbid that an attorney should advertise his talents or his skill as a shopkeeper advertises his wares. An attorney may properly accept a retainer for the prosecution or defense of an action for divorce when convinced that his client has a good cause. But for any one to invite or encourage such litigation is most reprehensible. The marriage relation is too sacred; it affects too deeply the happiness of the family; it concerns too intimately the welfare of society; it lies too near the foundation of all good government—to be broken up or disturbed for slight or transient causes.

"In the present case we are not called upon to deal with a matter of ordinary advertising, but with a peculiar kind of advertising. Respondent did not advertise for business openly, giving his name and office address. His advertisement was anonymous and well calculated to encourage people to make application for divorces who might otherwise have refrained from so doing. When a lawyer advertises that divorces can be legally obtained very quietly, and that such divorces will be good everywhere, such advertisement is a strong inducement—a powerful temptation—to many persons to apply for divorces who would otherwise be deterred from taking such a step from a wholesome fear of public opinion. * * * The advertisement published by respondent, to the effect that divorces could be legally obtained very quietly which should be good everywhere, was the more mischievous because anonymous. Such an advertisement

is against good morals, public and private; it is a false representation and a libel upon the courts of justice.

"Divorces cannot be legally obtained very quietly which shall be good anywhere. To say that divorces can be obtained very quietly is equivalent to saying that they can be obtained without publicity. Every lawyer knows that to obtain a legal divorce a public record must be made of the proceeding; the complaint must be filed; the summons must issue; process must be served upon the defendant either personally or by publication in a public newspaper; proof must also be taken; and a decree must be publicly rendered by the court having jurisdiction of the proceeding. All these public proceedings the statute imperatively requires, and for a lawyer by an advertisement to indicate that such public proceedings can or will be dispensed with by the courts having jurisdiction of such cases is a libel upon the integrity of the judiciary that cannot be overlooked when brought to our notice.

"In the case of *People ex rel.* v. *Brown*, 17 Colo. 431, 30 Pac. 338, this court said: 'When this court grants a license to a person to practice law, the public, and every individual coming in contact with the licensee in his professional capacity, have a right to expect that he will demean himself with scrupulous propriety, as one commissioned to a high and honorable office. A person enjoying the rights and privileges of an attorney and counselor at law must also respect the duties and obligations of the position.'

"The case of *People ex rel.* v. *Goodrich*, 79 Ill. 148, was a disbarment proceeding under statutes from which ours were undoubtedly borrowed. Among other things, the complaint against Goodrich set forth that he had published advertisements without signature, representing that he could procure divorces without publicity, and by such advertisements solicited business of that character by communication through a particular postoffice box. The Goodrich case, though similar to the one before us, was more aggravated in some respects. Mr. Justice Bresse, in delivering the opinion of the court, said: 'This

court, having power, by express law, to grant a license to practice law, has an inherent right to see that the license is not abused, or perverted to a use not contemplated in the grant.  In granting the license it was on the implied understanding that the party receiving it should, at all times, demean himself in a proper manner, and if not reflecting honor upon the court appointing him, by his professional conduct, he would at least abstain from such practices as could not fail to bring discredit upon himself and the court.  * * *  The morals of defendant's professional conduct deserves special notice.  He makes divorce cases a specialty.  How many persons in our broad land weary of the chain that binds them?  How many are eager to seize upon the slightest twig that may appear to aid them in escaping from a supposed sea of troubles, in which wedded life has immersed them?  How many are fretting under imaginary ills, and what better devices than those practiced by this defendant could be contrived to increase these disquietudes, and stimulate to effort, by perjury, if need be, to free themselves from their supposed unhappy condition?  Is it desirable that divorce cases should accumulate in our courts?  If so, the defendant is justified in the means he has used, and is using, to that end.  An honorable, high-toned lawyer will always aid a deserving party seeking a divorce, as coming strictly within his professional duties.  He will render the aid, not solicit the case; and he will, in all things regarding it, act the man, and respect, not only his own professional reputation, but the character of the courts, and discharge the unpleasant duty in all respects as an honorable attorney and counselor should do.' "

While this proceeding presents to the court a situation demanding punitive action, and while the higher interests of the public must not be underestimated, the effect upon the respondent of any action by this court must not be lost sight of and should be given impartial consideration.  An attorney is required to spend years in preparation for the practice of his profession, and this,

together with his years of experience, is, very often, his greatest asset.

Chief Justice Marshall, in *Ex Parte Burr*, 9 Wheat. 529, 6 L. Ed. 152, covered the situation fully in the following apt words: "On the one hand, the profession of an attorney is of great importance to an individual, and the prosperity of his whole life may depend on its exercise. The right to exercise it ought not to be lightly or capriciously taken from him. On the other, it is extremely desirable that the respectability of the bar should be maintained, and that its harmony with the bench should be preserved. For these objects, some controlling power, some discretion ought to reside in the court. This discretion ought to be exercised with great moderation and judgment; but it must be exercised; and no other tribunal can decide, in a case of removal from the bar, with the same means of information as the court itself."

As some extenuation of the respondent's unprofessional conduct, it appears that, when the bar association of Reno called his attention to the fact that his methods of advertising were condemned by the association, he discontinued the objectionable advertising in newspapers and theater programs and has since refrained from the same. As this is the first case of this character that has been brought to the attention of this court, we are disposed to be lenient with the respondent.

It is ordered that the respondent be, and he hereby is, suspended from the practice of the law for a period of eight months and until further order of this court, and that he pay the costs of this proceeding.