[No. 1983]

## RENO BAR ASSOCIATION, PETITIONER, *v.* ROBERT SCOULAR, RESPONDENT.

1. ATTORNEY AND CLIENT—DISBARMENT—EVIDENCE.
    Evidence in a disbarment proceeding examined, and *held* to show that the respondent's statement to the trial court, in an action for divorce in which he appeared for plaintiff, tried in March, 1911, that he knew that the plaintiff therein had been residing in Reno since March, 1910, was false and that certain testimony was misleading; and hence he would be suspended.

2. IDEM—DUTY OF ATTORNEY TO COURT.
    When requested by a court for information it is the duty of an attorney to give the court the facts within his knowledge, and, if he give his conclusions, the facts upon which such conclusions are based.

3. IDEM—ADVERTISING FOR DIVORCE BUSINESS.
    Rule in *In Re Schnitzer*, 33 Nev. 581, followed.

ORIGINAL PROCEEDING. Application of the Reno Bar Association for the disbarment of Robert Scoular, an attorney at law. **Respondent suspended.**

The facts sufficiently appear in the opinion.

*George S. Brown, Sardis Summerfield, R. C. Stoddard, W. M. Gardiner,* and *L. A. Gibbons,* for Petitioner.

*William Woodburn* and *Robert Scoular*, for Respondent.

*Per Curiam:*

This proceeding was instituted by the Reno Bar Association for the disbarment of the said Robert Scoular. The proceeding is based upon the following charges: That the said Robert Scoular caused to be inserted in the San Francisco Chronicle, on the days of October 16, 1910, October 21, 1910, November 6, 1910, February 5, 1911, and February 12, 1911, advertisements, all of which are in similar form, and one of which reads as follows: "Absolute divorces, prompt; first-class experienced lawyer. Robert Scoular, 200 Saturno Building, Reno, Nevada." That he caused to be inserted in the New York Evening Journal of April 26, 1911, an advertisement reading as follows: "Reno lawyer with New York offices; domestic relation laws of Nevada explained. Call or write Robert Scoular, Room 515, 1113 B'Way, 26th." That in a divorce case tried in the Second Judicial District Court of the State of Nevada, in and for Washoe County, on the 10th day of March, 1911, in which Rose Malkan was plaintiff and Henry Malkan was defendant, the said Robert Scoular became a witness at the trial and testified falsely relative to certain material facts.

The transcript of the evidence given in the Malkan case was submitted in this proceeding. It appears therefrom that after the evidence had been introduced by Mr. Scoular, as attorney for the plaintiff, the court asked Mr. Scoular the following question: "Have you any other proof of residence? You know she was here, do you?" To which Mr. Scoular replied, "Oh, yes; I know she was here." Whereupon the court directed that Mr. Scoular be sworn as a witness, and the following testimony was by him given:

"Q. (by the Court). When did you first become acquainted with this woman? A. Some time about the end of March, I think.

"Q. Last March? A. Yes, sir.

"Q. A year ago? A. Yes, sir.

"Q. Has she been living here since March, 1910?  A. I believe she has.

"Q. Have you seen her frequently?  A. I have seen her frequently; yes, sir.

"Q. Very frequently?  A. Oh, yes.  She was around off and on.

"Q. And you know where she has been living?  A. At the St. Albans."

Prior to the giving of the foregoing testimony, the plaintiff in the case, Rose Malkan, had testified that she resided in Reno, and had resided there since March 20, 1910; that she had been living at the St. Albans, a hotel in said city; that she had been out of the city just four or five days on a trip to San Francisco; that she was a *bona fide* resident of the State of Nevada, and that the only home she had was at Reno, and that she intended to remain there; that she had tried to find the defendant's residence and could not do so; that he had left the place where he formerly resided in the city of New York and had gone away; that she had tried continually to find him without success; that she left her husband on March 15, 1910, and came to Reno on March 20, 1910; that the reason she could not get service on her husband was because she did not know where he was; that she intended to live in Nevada.

The testimony given by Rose Malkan, above referred to, relative to her residence in this state, is flatly contradicted by the depositions taken in this proceeding of the said Henry Malkan, her former husband, and David Bloom, her father.  Henry Malkan, in his said deposition, testifies that his only residence during the year 1910 was the Hotel Gerard, No. 123 West Forty-Fourth Street, New York City; that the said Rose Malkan did not go to the State of Nevada prior to August 12, 1910; that until July 10, 1910, the said Rose Malkan was with her said husband, Henry Malkan, all of the time, excepting two short trips taken by her of about seventy-two hours each, till July 10, 1910, when she went to Block Island, R. I., with her father, sister, and two friends, where she remained

until July 20, 1910. The witness Henry Malkan further testifies that he received several communications from his said wife while at Block Island, one of which, in the form of a postal card, postmarked Block Island, R. I., July 18, 1910, and addressed to the said Henry Malkan at the Hotel Gerard, New York City, is attached to his deposition as an exhibit. Attached to the deposition of the said Henry Malkan are five other exhibits in the form of checks, one dated March 7, 1910, on the Hanover National Bank of New York City, drawn by Henry Malkan in favor of Rose Malkan, indorsed by Rose Malkan, and cashed by the Hotel Gerard, and paid through the New York Clearing House March 9, 1910. A similar check, dated March 28, 1910, was indorsed by Rose Malkan, cashed by the Hotel Gerard, and paid through the New York Clearing House March 29, 1910. Another similar check, dated May 28, 1910, indorsed by Rose Malkan, cashed by the Hotel Gerard, and paid through the New York Clearing House May 31, 1910. Another similar check, dated June 10, 1910, indorsed by Rose Malkan, cashed by the Hotel Gerard, was paid through the New York Clearing House June 10, 1910. The fifth check attached as an exhibit to the deposition of Henry Malkan is dated "New York, 6—3, 1910," signed by Henry Malkan, drawn on the Hanover National Bank in favor of Barnett Goldstein for the sum of $200, indorsed by Barnett Goldstein, and paid through the New York Clearing House June 4, 1910. Henry Malkan, in his said deposition, testifies that the last-mentioned check was in payment of a lavalier purchased by the said Rose Malkan in May, 1910, and that the said Rose Malkan was present with the said Henry Malkan when he gave the said check to Barnett Goldstein on the 3d day of June, 1910.

The deposition of Barnett Goldstein has also been offered in this proceeding, in which he testifies that he saw the wife of Henry Malkan on May 21, 1910, at his store, No. 1412 Fifth Avenue, in the borough of Manhattan, State and City of New York, at which time she purchased on memorandum a diamond lavalier; that he also

saw her in his said store June 4, 1910, when she brought in Mr. Malkan's check for the lavalier, which she had taken on memorandum on May 21, 1910; that he refreshed his memory as to the dates by referring to his books; that he saw the wife of Henry Malkan, accompanied by Henry Malkan, in his said store during the first few weeks of the month of June, 1910, to the best of his recollection.

David Bloom, in his deposition, testifies that he resided in New York City at the Manhattan Square Hotel; that Rose Malkan was his daughter; that he last saw Rose Malkan, during the year 1910, at about the end of August or the ·beginning of September, 1910, at his then residence, No. 117 West 119th Street, New York City, after she came back from her summer vacation; that up to the 12th of August, 1910, the said Rose Malkan was living with Henry Malkan at the Hotel Gerard, No. 123 West Forty-Fourth Street, New York City; that the said Rose Malkan returned to New York about March, 1911; that she is now known as Mrs. Henry Wilner, whom she does now claim as her husband.

The hotel register of the St. Albans was offered in evidence in this proceeding, and the court's attention directed to the date of March 24, 1910, where appears the signature of Rose Malkan, as having registered as of that date from New York. The signature in question is the last entry on that date and the last upon the page. The testimony relative to this entry is, to say the least, conflicting. The respondent, Robert Scoular, testified that his attention was called to it in October, 1910, by the proprietress of the hotel, about the time he prepared the complaint in the divorce action. The proprietress of the hotel was called as a witness. In reply to a question as to when she first saw Rose Malkan and as to her registering, she answered: "To the best of my knowledge, when my register shows, on the 24th of March, 1910"; that she remained at the hotel for a very long time; that she saw Mrs. Malkan register somewhere near March 24, 1910. She further testified that she had no books of account, showing payments made by Rose Malkan, that

would throw any light on the matter, as to when Rose Malkan first went to the St. Albans as a guest.

Mr. M. B. Moore, an attorney of this court, and deputy district attorney for Washoe County, testified that in May, 1911, at the request of one of counsel in this proceeding for the Reno Bar Association, he went to the St. Albans Hotel and examined the register, for the purpose of determining when Rose Malkan had registered there; that he examined the register covering the months of March to October, 1910, inclusive, and that the name of Rose Malkan was not at that time on the register where it now appears under the date of March 24, 1910.

We deem it sufficient now to say that we are not satisfied from the testimony and evidence that Rose Malkan registered at the time the register purports to show that she did. The positive testimony of Mr. Moore that he did not find her signature there in May, 1911, the fact that on March 28 or 29, 1910, four or five days after the purported registration of Rose Malkan, she cashed her husband's check in the city of New York, taken in connection with other circumstances herein mentioned, goes far to discredit the register. We think it is possible to clear up any question of doubt as to this matter, and that the doubt should be cleared.

Mr. Scoular offered in evidence the following letter, written on a letterhead of the St. Albans Hotel, which he testified he received from the said Rose Malkan:

"Reno, Nevada, Oct. 4, 1910.

"Mr. R. Scoular—Dear Sir: Have been here over six months. Kindly prepare my papers for divorce. I will call Thursday about 10 o'clock. Oblige, yours truly, Rose V. Malkan."

The following questions and answers, relative to the above letter, are taken from the transcript of the testimony of Robert Scoular in this proceeding:

"By Mr. Woodburn: Q. What did you do after receiving that letter; did you comply with the request? A. I happened to be over at the St. Albans Hotel, and I mentioned it to Miss Nash that I received a letter from Mrs.

Malkan, and I asked Miss Nash if Mrs. Malkan had been here six months.

"Q. What was her answer?   A. Her answer was that she had, and she showed me the entry.

"By Mr. Summerfield:   Q. Do you remember, Mr. Scoular, whether that letter came to you through the mails in an envelope?   A. It must have come through the mails, because she would not likely bring a letter if she came herself; it must have come through the mails.

"Q. Now, this is dated October 4th. When you received that letter, did you prepare her complaint?   A. I went over to see Miss Nash first.

"Q. I show you this same register that has been previously referred to, page 160, under date of October 4, 1910, calling your attention to the name Rose Malkan and the name Pearl Davis; in whose handwriting are those names?   A. In my handwriting.

"Q. How did you come to make those entries, Mr. Scoular?   A. Well, those ladies, as I understood it, came from California, and they called at my office, and we went over to the St. Albans, and they asked me to register for them, and I did it.

"Q. They came to your office and consulted you about a hotel, did they?   A. No; they wanted to go back to the same hotel that they had been living at.

"Q. Did they tell you that they had been there before? A. Yes; I knew they had been there before.

"Q. Did they ask you to go up with them?   A. Yes.

"Q. Did they give any reason for wanting you to go up there with them?   A. No; not that I remember.

"Q. But you went at their request, did you?   A. Yes.

"Q. Now, is that the day that you talked with Miss Nash?   A. I can't remember what day exactly that it was.

"Q. Well, now that I refresh your memory, then you do know that there was a particular time when you saw Mrs. Malkan at the hotel?   A. Yes, sir; I saw them at that time.

"Q. Then you had forgotten this registering, had you,

at the time you testified a few minutes ago that you did not remember any particular time that you saw Mrs. Malkan at the hotel?   A. Yes; I didn't remember having registered for them, except when you called my attention to it just now.

"Q. Is this date of October 4, 1910, as shown in this book, the correct date on which you registered them? A. I can't tell you.

"Q. To the best of your recollection?   A. I have no recollection about it; the book speaks for itself.

"Q. Have you any reason to believe that it is wrong? A. I can't tell you whether it is right or wrong; I can't recollect anything about it.

"Q. Now, after you have gone into this, can you give any further reason why Rose Malkan wrote you that letter of October 4, 1910, upon the identical date on which she was registered?   A. I can't tell you.

"By Mr. Woodburn:  Q. Can you remember whether or not you received the letter, signed by Rose Malkan, dated the 4th of October, 1910, before you saw her and Pearl Davis in the St. Albans Hotel?   What is your recollection about that?   A. I can't remember about that.

"Q. You testified that at the time you registered for them in October that you knew they had been at the St. Albans Hotel before.   How did you know that?   A. Because Mrs. Malkan told me that was where they were living.

"Q. Was that the only source of knowledge that you had?   A. That was all.

"Q. You stated that they made certain statements to you; they told you something when they returned at the time you registered them in October.   Do you recall what it was that they told you about their departure?   A. Well, that they had been on a visit to California for a day or so; that was all.

"Q. Did they ask you to register them on that day? A. Yes, sir.

"Q. Did they state why they wanted you to register? A. No; they did not say.

"Q. I understand you knew they had been at the hotel before, but they wanted you to register them? A. Yes, sir.

"Q. They made no explanation? A. No explanation."

The letter of October 4, 1910, and the registration of Rose Malkan and her companion by the respondent on the same date only tend to add to the uncertainty which pervades this case. If Rose Malkan was registered at the St. Albans prior to October 4, 1910, and was living there, it is difficult to understand why she should be again registered, or why she should call on the respondent on that day and request him to accompany her to the hotel, and why he should register herself and her companion, and why, if she called at his office on that day, and he accompanied her to the hotel, should she address a letter to him on the same date and transmit it through the mail upon a matter which must have been uppermost in her mind, and which she had every opportunity to communicate to him personally.

Giving to the respondent the benefit of all doubtful matters, certain facts, we think, may be set down as established on this proceeding: Respondent could not have known as a fact that Rose Malkan was residing in Reno from March to October of the year 1910. We are satisfied from the hearing on this proceeding that respondent's statement to the trial court, "I know she was here," was not justified and is inexcusable. As an attorney, when requested by the court for information, it was his duty to give the court the facts within his knowledge, and, if he gave his conclusions, the facts upon which they were based. The statement of counsel and his testimony, given upon the Malkan trial, were, at least, misleading, and their natural effect was to impress the court that witness had actual knowledge of a material fact, concerning which he could not have had such actual knowledge.

Relative to the advertisements published in the San Francisco Chronicle, it is admitted by respondent that they were inserted by him. This phase of the case is thoroughly covered in the case of *In re Schnitzer*, 33 Nev. 581, 33 L. R. A. (N. S.) 941, and nothing further

need be added as to the rule relative to such publications. It should be noted, however, that the form of these advertisements is less objectionable than those discussed in the Schnitzer case, and that none were published by respondent after the decision in the latter case. Respondent denied authorizing the advertisement in the New York Journal, and testified that it was inserted by a New York correspondent without his knowledge or direction. No evidence to the contrary was offered. Under the new criminal code, which went into effect on the first of the present year, but which, of course, does not affect this proceeding, it is made a misdemeanor to advertise for divorce business. (Rev. Laws, 6462.)

As before stated, a number of matters have been called to the attention of the court, as to the exact truth of which the court is not entirely satisfied. Giving to respondent the benefit of all doubtful matters upon which the evidence is uncertain or conflicting, enough remains, we think, as satisfactorily established, to warrant the suspension of the respondent,

It is ordered, therefore, that the said Robert Scoular be, and he hereby is, suspended until the further order of the court.