## In re DONOVAN

### (178 N. W. 143.)

(File No. 4360.   Opinion filed May 24, 1920).

1.   **Disbarment—Booklet Publication on "Law of Marriage, Divorce"
     Etc. Misleading Statements In Re S. Dak. As Divorce State
     And Attorney As Divorce Lawyer.**

     Where accused attorney in disbarment proceedings is shown to have published, sold and circulated a booklet entitled "The Law of Marriage, Annulment, Domicile, Divorce," for several years previous to filing complaint, purporting to contain synopsis of laws of various states pertaining to said subjects, which booklet contained many misleading statements relative to divorce laws of this and other states, and a number of purported newspaper articles accredited to such papers as The New York Journal, Atlanta Constitution, Minneapolis Journal, Philadelphia North American, St. Paul Dispatch and Cincinnatti Enquirer, which purported articles referred to defendant as a specialist and expert on the law of marriage and divorce, held, that the purpose of said publication is plainly of advertising: first, the State of South Dakota as place where divorces could be most easily obtained among the states; and second, defendant as the man best qualified of any one in the state to procure

such divorce; this being clear from certain matters contained therein, wherein it states as statutory causes and grounds for "absolute divorce" in South Dakota, consanguinity; fraudulent contracts; force in bringing about marriage; duress in compelling marriage; unsound mind of either party; another undivorced husband or wife living; non-age; impotency; adultery; extreme cruelty, physical or mental, wilful desertion for one year; driving the other from home by cruelty; threats, stratagem or fraud; refusal of matrimonial intercourse for one year; failure of husband to support wife for one year; habitual intemperance for one year; conviction for felony;—being sixteen designated purported grounds therefor.

2. **Same—Misrepresentation of Statute—Six Statutory Grounds for Divorce, Not Sixteen.**

Sec. 137, Code 1919, enumerates the only grounds—six in number—on which a divorce may be granted in this state viz.: (1) adultery; (2) extreme cruelty; (3) wilful disertion; (4) wilful neglect; (5) habitual intemperance; (6) conviction for felony; therefore defendant's statement, supra, that there are sixteen causes for divorce, is incorrect and misleading; nor is defendant's explanation of his booklet, namely, that the effect of annulment of a marriage is the same as a divorce, and that he "just grouped all the causes for both remedies together under one head," justifiable, since even then there be but twelve instead of sixteen enumerated causes. Furthermore, defendant failed to make similar grouping of causes for divorce and annulment in North Dakota, although their statute on those subjects is identical with our own (Secs. 4368, 4380 Comp. L. N. D. 1913.) Many other statements in the booklet are equally misleading.

3. **Same—Misrepresentations re Length of Residence for Divorce— Unwarranted Preference of South Dakota re Divorce.**

The table in said booklet purporting to state length of time of residence in this state necessary before commencing suit for divorce is fixed at seven months, and states that such action may be begun after plaintiff's domicile within the state for six months, that cause may be tried thirty days after service on defendant, that annulment suits are governed by provisions respecting citizenship, which, like domicile, is acquired in six months, that if cause accrued during plantiff's domicile without the state one year's domicile is required. **Held,** that while no part of this statement of the law is positively false, it is so badly garbled as to be misleading and deceiving; and since Secs. 156, and 158, Code 1919, require a residence of one year, providing that, if the cause of action arises in this state a six month's residence is sufficient. Furthermore, comparison of said

table with statutes of the various states shows that in nearly all states save South Dakota, length of residence is given at from two to ten months longer than that prescribed by the statutes; the effect of which is, and it could not have been intended otherwise than to convince a non-resident that he could get a divorce quicker by coming to South Dakota than in any place else.

4. **Same—Unfounded Representations of Newspaper Clippings of Defendant's Notorious Divorce Case Successes—Unprofessional, Dishonorable, Newspaper Advertising of Divorce Lawyer.**

Said booklet (containing only 112 small pages) consists mostly of 62 articles, each purporting to have been taken from a different newspaper, each giving an account of a more or less notorious divorce case in some state or foreign country; their origin being left wholly in doubt; and while defendant does not pretend he ever saw any of them in papers to which accredited, with perhaps one or two exceptions, he claims that he as a subscriber received them from certain "clipping bureaus," which he claims to have believed were genuine publications. Such explanation is not convincing; the alleged cases not seeming to have been of sufficient importance to have been published as news matter in metropolitan dailies; while their outstanding feature is a representation that defendant was the attorney for successful party, though those papers could have had no interest in so advertising him. In one article accredited to the "Mexico Daily Herald" defendant is referred to as "J. M. Donovan, the international expert on marriage and divorce;" and another as "J. M. Donovan, the well-known United States expert on marriage;" many others being of similar import. This constitutes advertising as a divorce lawyer through the public press, judicially declared to be unprofessional and dishonorable conduct.

5. **Same—Thirty Years a Lawyer, Re Divorce Cases, Good Citizen, Non-proof of Fraud or Over-reaching Clients—Practice Bringing State Reproach, Bar and Bench Into Disrepute—Professional Ethics Wanting—Ethics Forbidding Such Advertising.**

The evidence showed defendant engaged in law practice since 1889, confined so far as record shows to divorce cases, his sole means of livelihood, that he has a family; has always been a good citizen enjoying confidence and respect of the community; no claim being made that he has practiced fraud upon courts or overcharged or otherwise taken advantage of clients; yet this course of procedure has brought reproach upon the state abroad, and disrepute to the bar and courts of this state; he appearing to be without sense of propriety or ethics of the profession; which ethics forbid an attorney advertising his ability

or skill, and while he may properly accept retainer for prosecution or defence of a divorce action, when convinced his client has a good cause, yet for any one to invite or encourage such litigation is most reprehensible, condemnation for which cannot be too strong.

**6.   Same—Defendant's Unwarranted Practice, Whether Deserving Disbarment, Or Suspension—Suspension Adjudicated.**

In view of the facts found by referee and summarized supra; referee having recommended defendant's censure and that he be ordered to refrain from such conduct in future, the Attorney General excepting to referee's recommendation, by not recommending disbarment; and that his disbarment will deprive him of means of livelihood after reaching a time in life when it would be difficult for him to take up other business; it being unlikely that if permitted to continue law practice defendant will ever again be guilty of any of the offenses charged; while on the other hand his offense against professional ethics is too flagrant for dismissal with mere reprimand; it is adjudicated that defendant stand suspended from right to practice in any court of record of this state for a period of six months.

Original proceedings In the Matter of the application for disbarment of Joseph Mitchell Donovan, an attorney. Judgment of suspension from law practice for six months.

*Byron S. Payne,* Attorney General, for the prosecution.
*Aikens & Judge,* for Defendant.

POLLEY, J.   In March, 1918, an accusation was filed in this court accusing defendant of certain unprofessional conduct as a member of the bar of this state.   This accusation was referred to the Attorney General, with directions to investigate the matter set out in said accusation and to report the result of his investigation to this court.   The report filed by the Attorney Genaral was such that the court felt warranted in issuing an order directing that official to prepare and serve on defendant a formal complaint.   The matter was delayed because of the ill health of the defendant, and the complaint was not served until the 6th of September, 1918.

The complaint charges that at divers times, for several years previous to the filing of the complaint, the defendant had published and circulated a booklet entitled "The Law of Marriage, Annulment, Domicile, Divorce," purporting to contain a synopsis of the laws of the various states pertaining to Marriage, Annul-

ment, Domicile, and Divorce; that said booklet contains many misleading statements relative to the divorce laws of this and other states; that said booklet also contains a number of purported newspaper articles accredited to such papers as the New York Journal, Atlanta Constitution, Minneapolis Journal, Philadelphia North American, St. Paul Dispatch, and Cincinnati Enquirer, which said purported newspaper articles make reference to defendant as a specialist and expert on the law of Marriage and Divorce, but alleges that said articles never were in fact published in the newspapers to which they were accredited.

It is the theory of the complainant that the said booklet referred to in the complaint was published, sold, and distributed by defendant for the purpose of advertising, first, the state of South Dakota as the place where divorces could be most easily obtained, as compared with other states; and, second, defendant as the man who was the best qualified of any one in the state to procure such divorce.

[1] That such was the purpose of said publication is too plain to leave any room for argument. Reference to a few of the matters contained in said booklet will suffice to support this conclusion. At pages 39 to 50, inclusive, thereof, is set out what purports to be the statutory causes that will authorize an "absolute divorce" in the various states. On page 47 the causes for divorce in South Dakota are stated as follows:

"(1) Consanguinity (nearer than second cousins); (2) Fraudulent contract: (3) Force in bringing about the marriage; (4) Duress in compelling marriage; (5) Unsound mind of either party; (6) Another husband or wife living, undivorced; (7) Nonage; (8) Impotency; (9) Adultery; (10) Extreme cruelty, physical or mental; (11) Willful desertion for one year; (12) Driving the other from home by cruelty, threats, strategem, or fraud; (13) Refusal of matrimonial intercourse for one year; (14) Failure of the husband to support wife for one year; (15) Habitual intemperance for one year; (16) Conviction for felony."

[2] Section 137, Code 1919, enumerates the only grounds—six in number—on which a divorce may be granted in this state; therefore defendant's statement that there are sixteen causes for divorce must necessarily be incorrect and misleading. This is

explained by defendant in this way: That the effect of the annulment of a mariage is the same as a divorce, and that he just grouped all the causes for both remedies together under the one head. Even then, there would be but twelve causes, while defendant has enumerated sixteen. But, if the causes for divorce and annulment in this state had been grouped together in good faith, why did he not follow the same plan in case of North Dakota? The causes for divorce and annulment of marriage are exactly the same in that state as in this. Sections 4368 and 4380, Comp. Laws N. D. 1913. On page 45 of the booklet defendant enumerates the six grounds for divorce found in section 4380, Comp. Laws of North Dakota 1913, and says nothing about the causes for annulment. Many other statements are equally misleading.

On page 69 of the booklet is a table purporting to give the length of time one must have resided in the various states before he can commence an action for divorce. The time necessary for acquiring a domicile in this state is fixed at seven months, and on page 82 is the folowing paragraph relative to domicile:

"Action may be commenced after a domicile of the plaintiff within the state for six months. Cause may be tried before the court, on the equity side, thirty days after service on defendant. Annulment suits are governed by the provisions respecting citizenship, which, like domicile, is acquired in six months. If the cause accrued while the plaintiff was domiciled without the state, one year's domicile is required."

[3] No part of this statement of the law is positively false, though it is so badly garbled as to be misleading and deceiving. Sections 156 and 158 require a residence of one year, provided that, if the cause of action arises in this state, then a residence of six months is sufficient. A comparison of the table found on page 69 of the booklet with the statute of the various states will show that, in nearly all the states except South Dakota, the length of residence is given at from two to ten months longer than that prescribed by the statutes. The effect of this is, of course, and it could have been intended to have no other effect, to convince a nonresident that he could get a divorce quicker by coming to South Dakota than he could any place else.

[4] The newspaper articles mentioned in the complaint con-

sist of 62 separate articles, each of which purports to have been taken from a different newspaper. Each article gives an account of a more or less notorious divorce case, involving parties from many of the states of this country, and some from foreign countries. These articles occupy a large percentage of the entire booklet, which contains only 112 small pages. Their origin is left wholly in doubt. Defendant's explanation is as follows: He does not pretend that he ever saw any of said articles in the papers to which they are accredited, with perhaps one or two exceptions, but claims that he was a subscriber to certain "clippings bureaus," and that these bureaus sent the clippings to him; that he believed they were genuine and that they had in fact been published as matters of news in the said newspapers. This explanation is not very convincing. In the first place, these several divorce cases do not seem to us to have been of sufficient importance to have been published as matters of news in the metropolitan dailies of the Eastern cities. In the second place, the outstanding feature of each and every one of these articles is the fact that defendant was the attorney for the successful party. Certainly these papers could have no interest in advertising him and his divorce business in this manner. In one article, accredited to the "Mexico Daily Herald," defendant is referred to as "J. M. Donovan, the international expert on marriage and divorce." In another article, accredited to the Montreal Star, defendant is referred to as "J. M. Donovan, the well-known United States expert on marriage." Many others are of similar import. This constitutes advertising as a divorce lawyer through the public press, and is generally held by the courts to be unprofessional and dishonorable conduct. 6 C. J. 599.

This brings us to the more difficult question involved in the case to wit: What should be the judgment of the court The referee who tried the case recommends that defendant be censured by the court for his unprofessional and dishonorable conduct and that he be ordered to refrain and desist from such conduct in the future. The Attorney General excepts to the referee's recommendation, but does not recommend disbarment.

[5] It appears from the evidence that defendant was admitted to the bar in 1889, and that he has been engaged in the

practice of his profession constantly since that time; but, so far as the record shows, he has never given his attention to any other law business than that pertaining to divorce cases. This is his sole means of livelihood. He has a family. He has always been a good citizen and enjoyed the confidence and respect of people in his community. It is not claimed that he has ever overcharged . or in any way taken advantage of his clients, or that he has ever practiced any fraud upon the courts of the state. On the other hand his course of procedure has brought reproach upon the state abroad, and brought the bar and the courts of the state into disrepute at home. He appears to be without any sense of the proprieties or ethics of the profession.

"The ethics of the profession forbid that an attorney should advertise his talents or his skill as a shopkeeper advertises his wares. An attorney may properly accept a retainer for the prosecution or defense of an action for divorce when convinced that his client has a good cause. But for any one to invite or. encourage such litigation is most reprehensible." People v. McCabe, 18 Colo. 186, 32 Pac. 280, 19 L. R. A. 231, 36 Am. St. Rep. 270.

The practice of advertising or encouraging divorce litigation could hardly be condemned in stronger language, nor in our opinion could the condemnation be too strong. Re Schnitzer, 33 Nev. 581, 112 Pac. 848, 33 L. R. A. (N. S.) 941.

[6] To disbar defendant would be to deprive him of his means of livelihood after he has reached a time of life when it would be difficult for him to take up any other business. It is not at all likely that, if defendant is permitted to continue to practice law, he will ever again be guilty of any of the offenses charged in the complaint. But, on the other hand, his offense against the ethics of the profession has been to flagrant to be dismissed with a mere reprimand. To do so would be to reduce the case to a mere farce.

The judgment of the court will be that defendant will stand suspended from the right to practice for a period of six months from the entry of judgment herein.