THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, *vs.* WILLIAM H. BARNES, Plaintiff in Error.

*Opinion filed December 22, 1915.*

1. CRIMINAL LAW—*when court cannot say jury were not warranted in disbelieving defendant's story.* The Supreme Court can not say the jury, in a murder trial, were not warranted in disbelieving the defendant's story that he shot his housekeeper unintentionally while attempting, in self-defense, to take a revolver from her in a violent struggle which resulted in considerable injury to the defendant, where the evidence shows that the deceased was shot four times, (twice in the back,) that the rooms where the struggle is claimed to have taken place bore no evidence of any struggle, and that there were no marks of violence on the person of the defendant, who was drunk when the police officers came in response to his summons.

2. SAME—*judgment will not be reversed because attorney employed by defendant did not exercise greater skill.* Where the defendant in a criminal case is able to, and does, employ an attorney of his own selection, without any request on his part to the court to appoint other counsel and without changing his attorney until after the judgment of conviction, the Supreme Court will not reverse the judgment merely because the attorney who conducted the trial did not try the case as skillfully as might have been done.

WRIT OF ERROR to the Criminal Court of Cook county; the Hon. GEORGE KERSTEN, Judge, presiding.

SCOTT & JAFFIE, and SHORT, DAVIS & RUST, for plaintiff in error.

P. J. LUCEY, Attorney General, MACLAY HOYNE, State's Attorney, and GEORGE P. RAMSEY, for the People.

Mr. CHIEF JUSTICE FARMER delivered the opinion of the court:

Plaintiff in error, William H. Barnes, was indicted, tried and convicted in the criminal court of Cook county for the crime of murder and sentenced to the penitentiary for life. He has sued out a writ of error to have reviewed such judgment, and assigns for error that the evidence was not sufficient, that his rights on the trial were not properly protected by counsel, and that the court erred in its rulings on the admission and rejection of testimony and in the giving and refusing of instructions.

The proof shows plaintiff in error (hereafter called defendant) is a colored man about fifty-six years of age, a former employee, for several years, of the Pullman Palace Car Company. On January 19, 1914, he was living at 1640 South St. Louis avenue, Chicago, in property owned by him, with Nina Donahue, his housekeeper, also colored. On the day above mentioned, an acquaintance, Louis Schewing, called upon him about ten o'clock in the morning and he and defendant spent the day together. Between five and six o'clock in the evening defendant called the police headquarters by telephone and requested that officers come to his house. Several police officers were sent to defendant's house, arriving there about six o'clock P. M. Three of the police officers testified they found defendant and his friend in the front part of the house, drunk. Nina Donahue's body was found in the kitchen, on the floor. The doors between the front and the back rooms were locked, and the key to one door was found on the kitchen floor, under some paper, by one of the officers. A revolver, with five empty

chambers, and a hatchet, were found on the kitchen table. An empty whisky bottle was found on the kitchen floor near the body of deceased, and a bottle about one-half full of brandy was found in the front room where defendant and Schewing were. The officers testified they saw no evidences of a fight or struggle about the house and saw no marks of violence upon the person of defendant. Defendant first told the officers upon their arrival and in answer to their questions, that he had an argument with his housekeeper and had shot her. He later said that she had tried to kill him with a hatchet and had tried to shoot him, and said he had not wanted to kill her. The officers testified defendant and Schewing resisted arrest and were taken to the station by force.

Dr. LaCount, the coroner's physician, testified to having held a post-mortem examination of the body of deceased, and that she was shot once in the elbow, twice in the back and once in the chest, the bullet entering about level with the nipples and passing through the heart, and gave it as his opinion the death of deceased was caused by gunshot wounds.

Schewing, who was a witness called by the court, testified he knew nothing of the killing until the arrival of the officers; that he did not hear defendant call the police over the telephone nor hear any shots fired. He testified he and defendant had taken two drinks of brandy; that he had never seen deceased until the day of the visit, and only once that day, when she came into the front room and played the piano.

Defendant testified that deceased, Nina Donahue, was part Indian and part negro; that she was his housekeeper and a very good girl; that after Schewing came to his house on the morning of the homicide, and somewhere in the neighborhood of the noon hour, deceased came into the room where defendant and Schewing were and defendant asked her to play the piano. She played one piece and then

went to the back part of the house.  Defendant and 'Schewing, before deceased came into the room where they were, had been drinking brandy from a bottle sitting on a table. The bottle was about one-half full of brandy after they took their last drink.  After deceased had left the room defendant went to get the bottle for another drink and said it was gone,—that the girl had taken it away, although he does not claim to have seen her do so.  Defendant and Schewing in the course of their talk had spoken of Schewing's daughters, who were young women, and Schewing said they could play the piano.  Defendant said he asked Schewing to bring them to his house to play for him. When the first bottle of brandy had disappeared defendant got another bottle from a dresser drawer in his room, but says that neither he nor Schewing then drank out of it. About 4:15 P. M. Schewing was dozing off to sleep, and defendant went to the kitchen to get a drink of water and to tell deceased to prepare the evening meal.  She was not in the kitchen.  Defendant testified that after getting a drink he started to return to the front part of the house, where Schewing was, and found the door through which he attempted to pass was locked and the key gone.  On turning around he saw deceased with a hatchet in her hand, staring like someone wild.  He asked her why she locked the door, and she with much profanity told him she was going to kill him.  He asked her to be quiet and said he had company in the front part of the house.  She replied that defendant and the other man in the house were plotting to get her out of the house and bring the daughters of the other man in to run it, and said when she got through with him he could not bring the man's daughters to the house or marry one of them if he wanted to.  She then struck at him with the hatchet, but he warded off the blow, grappled with her, and they scuffled up and down on the floor until he finally got the hatchet from her.  They were then, he said, in his bed-room.  Defendant said he then went to

270 – 37

another door leading into the dining room and found it
locked also and no key in the door.  Deceased then went
to a dresser in the room, where she secured a revolver.  De-
fendant grabbed her and they scuffled, he trying to take the
revolver from her.  During the scuffle one shot was fired,
but the scuffle continued, deceased saying she was going to
kill defendant.  Two more shots were fired and deceased
groaned and released her hold on the revolver.  Defendant
said when he secured the revolver he intended to fire the
other chambers and did fire one of them; that he thought
he hit the door; that when he fired that shot deceased had
him by the hair; that she then hit him in the jaw, cut his
mouth and loosened his teeth, so that they were loose at the
time of the trial.  Deceased knocked or shoved him to the
floor, and when he fell the revolver was discharged again.
Deceased then disappeared and defendant lay on the floor
some time,—he could not say how long.  When he opened
his eyes everything was dark.  He pulled himself up, and
after steadying himself turned on the light, looked into the
kitchen and saw deceased lying, with her head toward the
stove, dead.  Defendant then examined himself to see if he
was shot, and finding that he was not, went out of the back
door, around to the front door and into the room where
Schewing was fast asleep.  He then went to the telephone,
called the police station, and testified he told the officer his
housekeeper had just been shot.  He says he was perfectly
sober when the struggle occurred between him and the de-
ceased, and that after going into the front part of the house
he took a drink of brandy and might have taken more than
he ought to have taken.  About that time the police came.
Defendant weighed 155 pounds and deceased 140 pounds.

The theory of defendant, as appears from his testimony,
was that deceased was jealous, made so by the talk about
Schewing's daughters; that she took the bottle one-half
full of brandy from the table in the front part of the house
and drank it, and when defendant went back to get a drink

and tell her to prepare the evening meal, deceased locked the doors leading to the front part of the house and then attempted to assassinate him. It is not surprising that the jury were not impressed with defendant's testimony. Considering the whole story,—the fact that deceased was shot four times, twice in the back, and that defendant entirely escaped; the testimony of all the police officers that the rooms bore no evidences of a struggle and that defendant's person showed no marks of any violence,—we cannot say the jury were not warranted in refusing to credit defendant's claim that the killing was accidental and not intentional. It is not a case where a reviewing court would be authorized to set aside the verdict on the ground that it was unwarranted by the testimony. *Gainey* v. *People,* 97 Ill. 270; *McCoy* v. *People,* 175 id. 224; *Lathrop* v. *People,* 197 id. 169; *People* v. *Cleminson,* 250 id. 135.

Defendant testified he worked for the Pullman Palace Car Company for many years but since 1911 had been in the real estate business. He built the home where he lived and where the killing occurred. The record shows he owned some property, and he had $54 in money on his person when arrested. He testified he was still under pay of the Pullman Palace Car Company and received his money every month. He employed his own counsel and was defended by an attorney of his own selection. The court was never requested to appoint counsel for him, nor was it ever intimated, so far as the record shows, until it was done in this court, that defendant had not been properly represented by counsel. The question is now raised by counsel who had no connection with the case until after the trial and conviction. The prosecution appears to have been conducted by one assistant State's attorney, with no other assistance. It is very clear *People* v. *Blevins,* 251 Ill. 381, and *Hayner* v. *People,* 213 id. 142, relied on by defendant, are in no way applicable here. It has never been considered the duty of the court to advise or exercise any authority or control over

the selection of counsel by a defendant who is able to and does employ the lawyer of his choice. Certainly it is the duty of the court in any criminal case to prevent oppression of the defendant and see that he has a fair trial, but we find nothing in the record to indicate this duty was not performed by the court. The claim of present counsel that defendant was not properly represented at the trial is based on the contentions (1) that no proof was offered of defendant's good character; (2) that defendant's counsel did not ask instructions on the theories of self-defense and accidental homicide; and (3) that Dr. LaCount, the coroner's physician who held the post-mortem examination, testified, in answer to questions asked on cross-examination by the defendant's counsel, that in his opinion the homicide was murder.

There is nothing in the record from which it appears that the defendant could have proved good character if he had tried to do so, or that it was unwise in his counsel not to attempt it. The defenses of self-defense and accidental killing were not specifically mentioned in the instructions. Self-defense was not claimed or relied upon by defendant. True, he testified the deceased assaulted him, first with a hatchet, and after he had taken that from her that she procured and drew a revolver on him, but he did not claim he killed her to protect himself. He testified the killing was accidental. No instructions were asked telling the jury if the killing was accidental and unintentional the defendant was not guilty. The instructions for the People were those usually given in a case where the charge is murder. They defined the crime, and what elements were necessary to constitute such crime, in the language of the statute. They also fully defined and distinguished manslaughter, and told the jury that under the indictment the defendant might be found guilty of murder or manslaughter, or that he might be found not guilty of any crime. The jury were expressly told that to constitute the crime of murder the killing must

be unlawful and with malice aforethought, and the term
"malice" was defined and explained. Although the defend-
ant's counsel did not ask the court to instruct the jury as
to the law where the killing is accidental and unintentional,
he did ask instructions, and the court instructed, upon the
question of reasonable doubt and other subjects proper to be
given in the case. It is hardly imaginable the jury would
have thought that if the killing was accidental it was their
duty to find, or that the law warranted their finding, de-
fendant guilty of murder, to constitute which they were told
the killing must be unlawful and with malice aforethought.
It is to be borne in mind that counsel now appearing and
raising this question took no part in the trial. For aught
we know, counsel who conducted the trial for defendant is
as able as counsel now representing him. The questions
raised on the record are not convincing that counsel who
tried the case was incompetent, and that the failure to
prove good character or to ask instructions of the charac-
ter mentioned establishes that fact. But is it to be permit-
ted that a defendant who is able to and does employ his
own counsel, may after conviction employ other counsel to
try his case in the higher courts and secure a reversal of
the judgment on the ground that defendant had not been
properly represented on the trial? We should be very re-
luctant to establish so dangerous a precedent.

A further ground upon which it is claimed defendant
was injured as a result of the incompetency of his counsel
on the trial is in the testimony of Dr. LaCount. On the
cross-examination of the doctor by counsel for defendant
the doctor was asked how he recalled the particular post-
mortem, and replied because it was murder and he was
particular in the examination. Counsel then asked how
he knew it was murder, and the doctor replied because of
wounds in the back, which could not have been self-inflicted,
he was of opinion it was murder. Counsel might have ob-
jected to the first answer, had it excluded and refrained

from asking further along that line.  He did not do so and did not at any time ask to have the answer excluded.  While we might differ with him as to the wisdom of this part of the examination of the doctor, it does not convince us he was not capable of conducting the defense.  A court of review cannot reverse a judgment of conviction in a criminal case where, in looking backward over the trial, it might seem defendant's counsel had made some tactical blunder. A judgment will not be reversed for failure of defendant's counsel to exercise the greatest skill.  *People* v. *Anderson,* 239 Ill. 168.

We are of opinion there was no reversible error in the giving and refusing of instructions, and finding nothing in the record that would justify a reversal of the judgment it is affirmed.                                  *Judgment affirmed.*