**In re ADES.**

No. 978.

District Court, D. Maryland.

March 19, 1934.

468

J. Craig McLanahan and Eli Frank, Jr., both of Baltimore, Md., for the prosecution.

Charles H. Houston, of Washington, D. C., and Thurgood Marshall, of Baltimore, Md., for respondent.

SOPER, Circuit Judge.

Bernard Ades, a member of the bar of the state and federal courts in Maryland, was ordered by this court on November 29, 1933, to show cause why he should not be disbarred from further practice as a member of its bar, because of alleged misconduct on his part in connection with certain cases in the courts of the state. Previously, Ades had been suspended from practice in this court when, on October 23, 1933, the court was about to hear an application for writ of habeas corpus designed to test the validity of the proceedings in a state court wherein Euel Lee had been convicted for murder and condemned to death. Lee had been twice convicted in the trial court. His case had been thrice reviewed in the Court of Appeals of Maryland (161 Md. 430, 157 A. 723; 163 Md. 56, 161 A. 284; 164 Md. 550, 165 A. 614), and a writ of certiorari had been denied by the Supreme Court of the United States. 54 S. Ct. 56, 78 L. Ed. ——. At the time of the suspension from practice, charges of unprofessional conduct, growing out of the murder case of Page

Jupiter had already been filed by the state's attorney for Baltimore City with the president of the Maryland state bar association. The present charges relate to three cases, in each of which a colored man was indicted for the commission of a crime of violence against a white person in one of the counties of the state, to wit, Euel Lee, alias Orphan Jones, charged with the murder of Green Davis on October 10, 1931, in Worcester county; George Davis, charged with assault with intent to rape Elizabeth Lusby on November 21, 1931, in Kent county; and Page Jupiter, charged with the murder of Evelyn Reifsnyder on July 8, 1933, in Charles county. Prior to the preferment of the formal charges against Ades, the final judgment of the court in each of these cases had been executed. Lee and Jupiter had been hung, and Davis had been committed to the Maryland penitentiary to serve a sentence of sixteen years.

Ades was charged with professional misconduct, malpractice, fraud, deceit, and conduct prejudicial to the administration of justice, substantially as follows:

### Euel Lee Case.

(a) That he improperly injected himself into the case both in the circuit court of Worcester county after the indictment was filed, and in the circuit court for Baltimore county, to which it was removed for trial, not primarily for the purpose of defending Lee and protecting him in his constitutional rights, but for the purpose of presenting and exploiting the views of the International Labor Defense by whom Ades was employed; and that lack of proper motive on Ades' part was clear, because he knew that Lee had previously admitted his guilt and had said that he did not desire Ades as his counsel.

(b) That before the trial of the case, Ades attempted to intimidate, threaten, and deceive Martha Miller, one of the witnesses for the state, and endeavored to get her to commit perjury at the trial.

(c) That before the trial, Ades falsely represented himself as the sole attorney for Lee, although he knew that the circuit court for Worcester county had appointed able counsel to represent Lee, who had accepted the appointment and were so satisfactory to him that he had said that he did not desire Ades as his counsel.

(d) That Ades, on the day before the execution of Lee, and without his request, had visited him in the deathhouse of the Maryland penitentiary, and caused him to execute a will, making Ades his beneficiary; and after his death, Ades sought by legal proceedings in the circuit court No. 2 of Baltimore City to secure the body of Lee in order that he might take it to New York and hold a memorial meeting over it in order to incite race prejudice.

### George Davis Case.

That Ades falsely represented that he had been engaged by Davis to represent him, although Ades knew that Davis had previously stated in writing that he was satisfied with other counsel appointed for him by the circuit court of Kent county, and that he did not desire Ades as his counsel.

### Page Jupiter Case.

(a) That Ades, on July 20, 1933, secured from Judge Stein, a member of the Supreme bench of Baltimore City, a writ of habeas corpus for the production of Page Jupiter, although he had not been engaged as counsel by Page Jupiter or by any member of his family, or by any one authorized to act for him, and did not disclose the facts to the judge.

(b) That at the hearing on the writ on July 21, 1933, Ades falsely represented that permission had been refused any counsel to confer with Jupiter, although Ades knew that Chief Judge Digges, acting for the circuit court for Charles county, had previously allowed two attorneys full opportunity to confer with Jupiter, and that said attorneys, after the conference, had filed a report with the state's attorney for Charles county in which they stated that Jupiter had not been deprived of his constitutional rights, but was being fully protected therein by the circuit court for Charles county.

### False Statements to the Press.

That Ades published from time to time in the public press in Maryland false statements embodying criticism of certain state judges and other officials of the state of Maryland.

An answer was filed denying the charges, and the District Judge being unwilling to sit in judgment upon charges preferred by him, the Senior Circuit Judge of the Circuit assigned another judge residing in the state to hear them.

### Euel Lee Case.

During the night of October 10 and 11, 1931, Green Davis, his wife, and his two daughters were shot to death as they lay sleeping in their home in Worcester county located two miles from the town of Berlin. Their bodies were discovered on October 12th, and late the same afternoon, Lee was arrested.

He was an elderly colored man, accustomed to farm work, but of an unusually high degree of intelligence for a person of that class. He had done some farm work for Davis a short time before, and had lived at the Davis home; but on October 12th, he was living in a room in the house of Martha Miller, a colored woman of Ocean City, and it was there that the arrest took place. He was taken to the magistrate's office in Berlin and locked up, and when he was searched, some articles, later identified as belonging to the murdered family, were found upon his person. The officers returned to the Miller house and found in Lee's room a shotgun belonging to Green Davis and various articles of feminine wearing apparel and jewelry, which also were subsequently identified as belonging to the family. The same night the prisoner was taken to the jail at Snow Hill in an automobile, in which he sat handcuffed between two county officers. They accused him of the crime and endeavored to persuade him to confess, and when he refused and made profane replies to the officers, one of them struck him on the forehead with a blackjack. Arriving at the jail at Snow Hill, the county seat, he was given medical treatment for his wound, and was then continually questioned until on the afternoon of October 13th, he confessed the crime. Fearing that he would be lynched by lawless people of the community, the officers brought him by automobile to the Baltimore City jail. There on October 15th he made a second confession. It is noteworthy that neither confession was offered in evidence at either of the two trials of the case on the merits which ensued, and it is reasonable to infer that the state did not care to meet the charge of duress that doubtless would have been made had the confessions been offered in court. No doubt as to the guilt of Lee, however, is implied. On the contrary, the evidence subsequently offered against him at his trials was overwhelming, and, in the final trial, no witness was called in his behalf.

The newspapers in Baltimore were filled with accounts of the crime, and in the evening of October 13th and the morning of October 14th, the story was carried that after a grilling of sixteen hours throughout the night in the Snow Hill jail, the prisoner had confessed. Ades' interest in the case begins at this point. He was then 28 years of age. He had been educated in the academic department of the Johns Hopkins University, and at law at the University of Maryland, and had come to the bar in 1924. He had never had a criminal case. His reputation as a practitioner in civil cases was good. He belonged to the Communist party, and believed that it is difficult in the courts of this country to secure full recognition of the rights of laboring men or of members of inferior races, because judges and other officials are usually chosen from the ruling or favored classes, a belief not commonly held in a country where officials are elected by the people or chosen by their representatives.

Ades was a close friend of one Louis Berger, secretary in the Baltimore district of the International Labor Defense. This body, while not formally connected with the Communist party, is officered by Communists, and within its scope, has like purposes and beliefs. It interests itself in cases in the courts which involve classes of persons whom it regards as victims of oppression or prejudice, and frequently offers its assistance when such persons are charged with crime. Berger, acting for the International Labor Defense, employed Ades to investigate the Lee case with a view toward undertaking its defense. No fee was promised or given. In fact, the uncontradicted evidence is that Ades received no compensation for any of the cases covered by this investigation, although substantial sums were raised to pay the court expenses of the Lee case which included three appeals to the Court of Appeals of Maryland.

On October 13th or 14th, Ades went to the Baltimore City jail but was refused permission to see Lee, first being told that the prisoner was receiving medical treatment, and later that he was being held subject to the orders of the county authorities and could not be interviewed without their consent. The warden of the jail telephoned to the state's attorney for the county, and Berger wired him demanding permission, but it was refused. On October 17th, Ades, as attorney for Berger, applied to Judge Frank in the Baltimore City court for a writ of habeas corpus to bring up the prisoner. The writ was issued and the hearing was set for October 19th, the judge assuming, although no express representations to this effect seem to have been made, that Ades had been employed as counsel either by the prisoner himself or by some one in his behalf. In the meantime, it had been arranged in Worcester county to secure an indictment and to arraign the prisoner in Snow Hill on that day. So it was agreed between the judges of the two courts that the hearing in the habeas corpus proceeding should be postponed, and that Ades would be given an opportunity to see the prisoner when he was taken to Snow Hill for the arraignment.

Ades went to Snow Hill, arriving several

hours before the prisoner. He had a conference with the Circuit Judge of the county, in which he gave an account of his own education and professional experience, and of the character of the International Labor Defense and of his employment by that body in the pending case. When the prisoner arrived, the judge asked him whether he knew Ades or desired to talk with him, but the prisoner seemed reluctant to do so. The judge finally prevailed upon him to go with Ades into an adjoining room, where a conference took place. The prisoner told Ades that he was innocent of the crime and that the confession had been gotten from him by force. Ades told the prisoner that the International Labor Defense would undertake his case, and if the decision was adverse in the trial court, it would take an appeal to the Court of Appeals if his constitutional rights were denied. The prisoner accepted Ades as his counsel, and thereupon they returned to the courtroom. The judge announced that the court had appointed J. Franklin Upshur, a well-known lawyer of the county, to act as counsel for the prisoner, and that Ades would also serve as a volunteer in the same capacity. The prisoner was then arraigned and entered a plea of not guilty and prayed a jury trial. He was then immediately taken from Snow Hill to Cambridge, the county seat of Dorchester county, Md., sixty miles away, to avoid the possibility of a lynching, and after he was lodged in jail, the chief judge of the circuit, a resident of Cambridge, hearing that undesirable characters were on their way to Cambridge in automobiles, ordered the sheriff to take the prisoner to the Baltimore City jail.

Ades was not rebuked by the county court for tendering his services as an attorney chosen by the International Labor Defense, but, on the contrary, he was recognized as one of the lawyers for the defendant. The trouble came later. Ades went to New York to confer with the officials for the organization. While there, he telegraphed Upshur at Snow Hill protesting against the trial of the prisoner on October 22d, as indicated by the newspapers, and insisting upon a change of venue to the Western Shore of Maryland. Upshur replied that the case had not been set for trial and that counsel for the prisoner had a right to confer with him in the Baltimore City jail. He added, that with the consent of the court, he was about to withdraw from the case, and shortly thereafter did so, being persuaded by the importunities of his family and his friends. The court thereupon appointed as counsel for the prisoner F.

Leonard Wailes, a resident of Salisbury in the adjoining county of Wicomico, a leading lawyer of the state, who had enjoyed a successful practice for more than thirty years especially in the county courts of the Eastern Shore. He came to Baltimore and conferred with Lee in the jail as his counsel, but no mention was made of Ades since at the time Wailes did not know of his connection with the case.

Before this visit, Ades had seen Lee in the jail and had secured from him, and filed with the clerk of the circuit court for Worcester county, a signed retainer, to investigate the case and to act as his sole counsel therein, the authority containing the statement that Lee did not desire any other attorney. Learning through the newspapers of Wailes' appointment, Ades wrote him a letter received after his visit to Lee at the jail, informing him of the signed authority but consenting to Wailes' appearance as counsel in the case on condition that he would defend the case along lines most conducive in Ades' opinion to a fair trial. Ades insisted in heated terms that two policies should be adopted in the defendant's behalf: (1) That the case should not be tried before the local judges or in any of the courts on the Eastern Shore; and (2) that negroes should be included in the trial jury. In support of these conclusions, Ades declared that the local police, without investigating the case, had procured a confession from the prisoner by barbarous torture, and that if property of the murdered man was found in Lee's lodging, the police had put it there; also that the state's attorney, although informed of the physical violence to which Lee had been subjected, had taken no steps to prosecute the offenders; that the judges themselves had raised no objection when the state's attorney on October 13th, the day after the arrest, had announced the trial would be held in a week, indicating an intent to railroad the prisoner to the gallows; that threats of mob violence on October 13th and again on October 19th had necessitated the removal of the prisoner to the Baltimore City jail, and that on October 26th, when it was rumored that Lee was in the Snow Hill jail, a mob of hundreds of men from all parts of the Eastern Shore surrounded the jail and, having gained entrance, made a thorough search for the defendant, and that no effort had been made by the authorities to prosecute the members of the mob. Mr. Wailes was naturally indignant when he was invited to submit to the absolute control of a young and relatively inexperienced lawyer in the conduct of the case, and his feeling was intensified

by the condemnation heaped upon the judges, the state's attorney, and the police officials of the community in which he made his home. He wrote to Ades that he had consented to act as counsel in the case as a duty placed upon him by the court, and suggested that Ades meet him in Snow Hill on November 5th so that their status in the case might be determined by the court.

In the meantime, Ades had been seeking evidence for the defense in Worcester county through a young woman provided by the International Labor Defense who, representing herself as a saleswoman, visited various places and made inquiries. On November 3d she called at the house of Martha Miller, an elderly colored woman of the old-fashioned type, in whose home Lee had had lodging. The investigator questioned the colored woman closely as to whether the officers of the law, or any other person, could have placed in Lee's room the several articles belonging to the deceased family which were found there after Lee's arrest; and obviously regarding the witness as important, persuaded her, with some difficulty, to drive to Baltimore to see Ades. That night in his office the old woman was again examined and cross-examined on the point, but the story that she had told the investigator in the first instance could not be shaken that the goods were found when she first led the officers to Lee's room on the evening of his arrest. Ades told her that she ought not to say that Lee had brought the articles to the room, since she had merely seen Lee go back and forth with a satchel, and that she should merely testify how the goods were found. When he was through questioning her, he telephoned to ascertain the cost of a return trip to Ocean City, gave her $7.50 for expenses, and told her how to find her daughter's house in Baltimore where she had decided to spend the night. Before the woman was brought to Baltimore, her husband and certain white people were told of the contemplated trip, and shortly after she left Ades' office, Baltimore detectives, having received information from Snow Hill, arrested her and took her to headquarters. There she made a statement as to what had happened in her interview with Ades and the investigator, which did not materialy differ with what has already been set out above. At the subsequent trials of the case, this woman was the star witness for the state.

Ades had been warned by the warden of the city jail that if he went back to Snow Hill, he would be lynched. He motored to Snow Hill on November 4th with the investigator and met Wailes in the courthouse. They were not in accord as to the conduct of the case. Wailes thought that it could be fairly tried on the Eastern Shore, without negro jurymen. He showed Ades' letter of October 29th to the judges and was told that thenceforth he was to act alone for the defense. He prepared and mailed to the defendant in Baltimore a suggestion, supported by affidavit, that he could not get a fair trial in Worcester county, and that the proceedings should be removed to some other county on the Eastern Shore. Ades does not seem to have been informed at the time of his removal as counsel for Lee, and he left with the judge a suggestion for removal to some court on the Western Shore of Maryland, supported by an affidavit previously executed by Lee wherein reference was made to the several manifestations of violence against him by lawless elements of the local community. Both suggestions were marked by the clerk as if filed on November 6th, and on this day, the court ordered the removal of the case for trial at Cambridge in Dorchester county.

During the course of the day, it was noticed that the woman investigator had a revolver, and she was arrested, charged with carrying a concealed weapon, and required to give bail for her subsequent appearance. Ades himself was twice visited by a committee of citizens, once upon the street and once in the courthouse, and ordered to leave the city. When he had finished his business in the courthouse and was ready to leave, it was necessary to surround him and the investigator with a corps of officers in order to protect them from the threatening mob, while the judge walked behind during their progress to Ades' automobile a square away. When they reached the car, it was found to have been maliciously injured so as to be incapable of operation, and refuge was taken in the county jail until the officers were able to procure another car and spirit the lawyer and his companion away.

On November 5th, the International Labor Defense sent a telegram to the chief judge of the circuit, which in substance denounced the attempt to lynch Ades and his associates, the arrest of the investigator, and the whole campaign to torture, railroad, and lynch the prisoner on a framed-up murder charge. The judge was called on to take immediate action to stop these unlawful acts, and a change of venue to Baltimore and a trial by a jury composed one-half of negroes was demanded. On the same day, the Baltimore papers stated that the circuit judge for Worcester county had announced that no lawyer for the Inter-

national Labor Defense had any standing in his court, and that Ades would no longer be recognized as attorney for Lee.

Thereafter, Ades was again refused access to Lee by the warden of the Baltimore City jail and again applied to Judge Frank of the Supreme Bench of Baltimore City for relief. A deputy state's attorney of Baltimore City, at the request of the judge, interviewed Lee at the jail and brought back a signed statement that he wanted both lawyers if they could work in union together. Later, Wailes, being unwilling to act jointly with Ades, came to Baltimore, and with the deputy state's attorney, visited Lee and told him that he could not have both lawyers, whereupon Lee signed a statement that if Wailes would not try the case with Ades, the latter would have to retire. At this juncture Ades brought a suit in the Baltimore City court against the warden of the Baltimore city jail, praying that a writ of mandamus be issued against the warden commanding him to permit the petitioner to see the prisoner. At the hearing of the case Wailes and Ades were both present. Lee was produced and Ades was given an opportunity to confer with him privately. Thereupon Lee stated to the court that he desired Ades for his lawyer and the petition for writ of mandamus was granted. Wailes retired from the case which was thereafter conducted by Ades with the assistance of David Levinson, an attorney from Philadelphia.

The subsequent events in the Lee case have a bearing on the charges against Ades because they serve to show that he persistently demanded the rights of the accused in two important particulars, that is, the right of removal of the case from the excited and hostile community of the Eastern Shore, and the right to trial by a jury from which negroes as a class were not excluded. Neither of these matters was considered of importance to the defendant by counsel appointed by the circuit court for Worcester county. At his request, the case had been removed for trial to Cambridge in Dorchester county, on the Eastern Shore. After his retirement from the case, Ades, by formal motion, supported by reference to previous threats and acts of violence directed against the prisoner, prayed the court to reconsider its former action and remove the trial to some court sufficiently distant from Snow Hill and Cambridge on the Eastern Shore to make possible a trial by a fair and impartial jury. This motion was denied and an appeal was taken. The Court of Appeals of Maryland in Lee v. State, 161 Md. 430, 157 A. 723, fully reviewed the in-

cidents referred to, and the further circumstances that in contemplation of a trial at Cambridge, elaborate provisions were thought necessary for guarding the prisoner and his counsel with troops and state police while in the town, and while going to and from the town in boats, and that the Attorney General of the state had announced his conviction that a fair trial could not be had, and should not be attempted in Dorchester county. The court held that under article 4, § 8, of the Maryland Constitution, a defendant in a capital case is entitled as a matter of constitutional right to have his case removed from the court where the indictment is found upon a suggestion in writing, under oath, that he cannot have a fair and impartial trial; that the selection of the forum is within the discretion of the removing court, and its decision is not a final judgment immediately reviewable on appeal. Nevertheless in order to prevent a subsequent reversal of a conviction of the prisoner, if one should be had, the court, in discussing the appeal, expressed the view that the removal of the case to Dorchester county was improper. The court said (page 442 of 161 Md., 157 A. 723, 727):

"In the opinion of this court, the conditions evidenced by the occurrences recited would leave no latitude for discretion, but would demonstrate that the securing of a fair unprejudiced jury from the county selected as the place for the trial of the charges against this man, and any defenses he may make, is unlikely, and that to attain the object of the Constitution and statutes the cause must be removed for trial to some other portion of the state, on the one shore of the bay or the other, where it appears at least much more likely that the local prejudice may be avoided. That there is, in the section of the state so far selected, such prejudice as forbids attempting a trial there, seems to this court to be manifested. * * *"

The circuit court for Worcester county then ordered that the case be removed for trial to the circuit court for Baltimore county on the Western Shore, where the defendant was subsequently tried and convicted. During the trial, the point was made by the defendant's counsel, and overruled by the court, that in violation of the provisions of the Fourteenth Amendment of the Federal Constitution, negroes were excluded from those summoned to make up the jury panel. The case was carried a second time to the Court of Appeals which held in Lee v. State, 163 Md. 56, 161 A. 284, that the point was well taken because the judge who had been drawing juries for the county throughout twenty-six

years, had never selected a negro for jury service although the negroes numbered nearly 10 per cent. of the population, and that this fact justified the inference that negroes were excluded because of their color, thus denying the equal protection of the laws in violation of the Fourteenth Amendment upon the trial of a negro upon a criminal charge.

A second trial and conviction, and a third appeal followed. See Lee v. State, 164 Md. 550, 165 A. 614. This time the judgment was sustained, and the defendant was subsequently executed after ineffectual attempts were made to secure a writ of certiorari from the Supreme Court of the United States, a writ of habeas corpus from the United States District Court for the District of Maryland, and the interposition of the Governor of the state.

■■ The evidence has been reviewed at considerable length because the case has been freely and publicly discussed, and has given rise to much controversy and bitterness of feeling. Many conflicting statements as to the facts have been made, and it is now possible for the first time to state them in a connected story gathered from the testimony in a deliberate trial in court. We are now in a position to consider the charge of unprofessional conduct contained in the specifications. The first is that Ades improperly injected himself into the case in the circuit court for Worcester county and in the circuit court for Baltimore county, not primarily for the purpose of defending the prisoner, but for the purpose of presenting the view of the International Labor Defense, when he knew that Lee had confessed and did not desire him as counsel. The evidence does not show that Ades entered the case in the manner charged. Lee accepted Ades as one of his counsel at the beginning of the case, and finally chose him in preference to counsel appointed by the court when the latter was unwilling to serve with Ades. Moreover, the validity of a confession, which was never presented to the court, must forever remain open to serious question. Since the prosecution was unwilling to offer it at the trial, we may not assume that a lawyer about to offer his services in defense of the accused, should accept as true an admission made by the prisoner under circumstances indicating violence and duress. But even if Lee had freely confessed, he would have been entitled to counsel if for no other reason than that some one might speak for him in respect to the sentence to be imposed. Article 27, § 403, of the Maryland Code provides that a person convicted of murder in the first degree shall suffer death or undergo confinement for life, in the discretion of the court, and gives the jury in a murder case the right to provide that the prisoner shall not be subjected to capital punishment even when convicted of murder in the first degree. The Fifth Canon of Professional Ethics of the American Bar Association provides:

"It is the right of the lawyer to undertake the defense of a person accused of crime, regardless of his personal opinion as to the guilt of the accused; otherwise innocent persons, victims only of suspicious circumstances, might be denied proper defense. Having undertaken such defense, the lawyer is bound by all fair and honorable means, to present every defense that the law of the land permits, to the end that no person may be deprived of life or liberty, but by due process of law."

The remainder of this specification charges that the respondent injected himself into the case not primarily for the purpose of defending the prisoner, but for the purpose of presenting and exploiting the views of an organization that had no standing in the court. What these views were, the charge does not say; and the only evidence on the point was given by the respondent who said that the International Labor Defense offers its aid in cases like Lee's because it believes that it is difficult for a colored person charged with a major crime against a white person to get a fair and impartial trial. That the defendant shared this belief there can be no doubt; and thus the question arises whether he is to be adjudged guilty of unprofessional conduct because he volunteered his services to a needy defendant at the behest of such an organization.

■ The Canons of Professional Ethics of the American Bar Association and the decisions of the courts quite generally prohibit the direct solicitation of business for gain by an attorney either through advertisement or personal communication; and also condemn the procuring of business by indirection through touters of any kind. It is disreputable for an attorney to breed litigation by seeking out those who have claims for personal injuries or other grounds of action in order to secure them as clients, or to employ agents or runners, or to reward those who bring or influence the bringing of business to his office. Canons 27 and 28 of Code of Ethics, 1929. "The foundation on which this principle of conduct rests is that attorneys at law practice a profession; they do not conduct a

trade. It is incompatible with the maintenance of correct professional standards to employ commercial methods of attracting patronage." In re Cohen, 261 Mass. 484, 159 N. E. 495, 497, 55 A. L. R. 1309. Moreover, it tends quite easily to the institution of baseless litigation and the manufacture of perjured testimony. From early times, this danger has been recognized in the law by the condemnation of the crime of common barratry, or the stirring up of suits or quarrels between individuals at law or otherwise. In Maryland, it is a misdemeanor for an attorney habitually to go to places of criminal punishment to solicit the clientage of persons confined therein awaiting trial, without first having been sent for by such persons or by their friends; or to solicit such clientage through officers of the law or professional law breakers, and upon proper proof, the lawyer must be suspended from practice in all the courts of the state for a period not less than a year. The judges of the state courts are required to observe the demeanor of all attorneys practicing law before them, who shall use any indecent liberties to the lessening of the grandeur and authority of the courts, and to punish the same according to the nature of the offense either by suspension from practice perpetually or for a time or by fine. Maryland Code, article 10, §§ 10, 14. In other states, disciplinary proceedings aimed at the practices described have generally resulted in censure or suspension, and in extreme cases, in disbarment of the offender.[1]

Notwithstanding these salutary rules, it cannot be laid down as an inflexible maxim that a lawyer may never volunteer his services to a litigant, where the litigant is in need of assistance, or where important issues are involved in the case; and this may be so even though questions of a controversial or political character are at stake. Thus we read in Boswell's Life of Johnson (Hill's Edition), vol. 3, pp. 99, 100, 229, 230, 241, 243, of the habeas corpus proceeding in an English court in the interest of James Somerset, a negro slave who had escaped from his master, 20 Howell's State Trials, 1, 23, Loftt's Reports, 1772, p. 1, where distinguished counsel appeared on the negro's behalf; and of the similar cases in Scotland of Knight v. Wedderburn and Shedden v. Shedden, reported in 20 Howell's State Trials 1, note. In New York, Andrew Hamilton was brought into the libel case of John Peter Zenger in 1734 by the "Sons of Liberty" to assist counsel appointed by the court to defend him. Great American Lawyers, edited by Wm. Draper Lewis, vol. 1, p. 30, 17 Howell's State Trials, 676, 686, 694. Alexander Hamilton gratuitously appeared for the defense in Croswell v.

[1] Advertising for business is quite generally condemned. People v. Berezniak, 292 Ill. 305, 127 N. E. 36 (censure); Barton v. State Bar of California, 209 Cal. 677, 289 P. 818 (censure); In re Swihart, 42 S. D. 628, 177 N. W. 364 (with other grounds; suspension).

Particularly reprehensible is advertising for divorce cases. People v. MacCabe, 18 Colo. 186, 32 P. 280, 19 L. R. A. 231, 36 Am. St. Rep. 270 (suspension); In re Donovan, 43 S. D. 93, 178 N. W. 143, 9 A. L. R. 1497 (suspension); People v. Goodrich, 79 Ill. 148 (disbarment); In re Schnitzer, 33 Nev. 581, 112 P. 848, 33 L. R. A. (N. S.) 941 (suspension); In re Oliensis, 26 Pa. Dist. R. 855, 860 (other causes; disbarment); Matter of Neuman, 169 App. Div. 638, 155 N. Y. S. 428 (violation of statute; suspension); Mayer v. State Bar of California (Cal. Sup.) 26 P.(2d) 9 (suspension). See, also, 9 A. L. R. 1500 note.

Personal solicitation of business for gain is generally held unprofessional. Matter of Schwarz, 175 App. Div. 336, 161 N. Y. S. 1079 (censure), Id., 195 App. Div. 194, 186 N. Y. S. 535, affirmed 231 N. Y. 642, 132 N. E. 921, 923 (disbarment; Pound and Cardozo, JJ., and Hiscock, C. J., dissenting on grounds that offenses "against good taste rather than good morals" are not grounds for disbarment); Matter of Gray, 184 App. Div. 822, 172 N. Y. S. 648 (censure); In re Winthrop, 135 Wash. 135, 237 P. 3 (criminal cases; suspension); Ex parte Hittson, 15 N. M. 6, 99 P. 689 (criminal case; suspension).

Stirring up litigation in person or by agents—ambulance chasing—is ground for disbarment. Matter of Clark, 184 N. Y. 222, 233, 77 N. E. 1; Matter of Rothbard, 225 App. Div. 266, 232 N. Y. S. 582; Fish v. State Bar of California, 214 Cal. 215, 4 P.(2d) 937 (personal and through agents; suspension); Appeal of Maires, 189 Pa. 99, 41 A. 988 (with other causes; disbarment); Chreste v. Commonwealth, 171 Ky. 77, 186 S. W. 919, 926, Ann. Cas. 1918E, 122 (disbarment or suspension); In re Gorsuch, 113 Kan. 380, 214 P. 794 (disbarment); and see In re Gill, 104 Wash. 160, 176 P. 11 (censure); Ingersoll v. Coal Co., 117 Tenn. 263, 310, 98 S. W. 178, 10 Ann. Cas. 829; People v. Edelson, 313 Ill. 601, 145 N. E. 246; State v. Smith, 84 W. Va. 59, 99 S. E. 332.

The People in New York in 1804. Great American Lawyers, vol. 1, 373. George Hay and William Wirt in 1800 volunteered to defend James Thompson Callender. Beveridge's "Life of John Marshall," vol. 3, 38, Wharton State Trials, 692. Coming to the state of Maryland, it is recalled that Luther Martin tendered his services in the defense of Aaron Burr, when charged with treason, Beveridge's "Life of John Marshall," vol. 3, p. 428; and that in the Dred Scott Case, in which it was said that the free soil interests were in charge of both sides of the litigation, Reverdy Johnson volunteered his services out of consideration for the court. Ewing on Legal and Historical Status of the Dred Scott Decision, 29, 30; Shouler's History of the United States, vol. 5, 378; Steiner, Life of Reverdy Johnson, 37. Lest it may seem to be a far cry from these historic incidents to the present case, it may be noticed that more recently, in State v. Smith, 84 W. Va. 59, 99 S. E. 332, 333, it was held not to be unprofessional for an attorney to go to the jail and agree to serve five ignorant Russians there confined without specific charge being lodged against them. The court said: "In many, in fact in most instances, it is unethical, and may be a ground of suspension from the practice, but there are many instances in which such would not be the case, and a general statement that one solicited employment without showing that such solicitation was in a dishonorable or a disreputable way is not a sufficient charge to justify suspension or disbarment." In Scopes v. Tennessee, 154 Tenn. 105, 289 S. W. 363, 53 A. L. R. 821, Clarence Darrow, of counsel for the defense, was secured by the American Civil Liberties Union; and in the Scottsboro Case, Powell v. Alabama, 287 U. S. 45, 53 S. Ct. 55, 77 L. Ed. 158, 84 A. L. R. 527, where the Supreme Court set aside the conviction of seven negroes charged with the crime of rape upon two white girls, on the ground that the trial court had not provided counsel for them in the proper manner, Walter H. Pollak, leading counsel for the defense on appeal, was secured by the International Labor Defense. ██ It is not contended by those upon whom the burden of prosecuting the charges in this case has fallen that it is always improper for a lawyer to volunteer his services, but that the evils inherent in the solicitation of criminal cases are so great that exceptions must be guarded with the greatest care. Hence it is said that when a lawyer is acting either on his own motion or on behalf of a defense organization, he should not approach a prisoner until he has obtained permission from the court having jurisdiction of the case, after a full and complete disclosure of the reasons and purposes which underlie the proffer of his services; and if the lawyer fails to make prior application to the court, or if the court decides that the motives and purposes are improper, the lawyer should be denied access to the prisoner and the prisoner should be denied the right to avail himself of the lawyer's services.

So sweeping a rule, however, would not only be impracticable in operation, but in some cases it would amount to a denial of the defendant's rights. It was held in Powell v. Alabama, 287 U. S. 45, at pages 68, 71, 53 S. Ct. 55, 77 L. Ed. 158, 84 A. L. R. 527, that the right of the accused at least in a capital case to have the aid of counsel for his defense is one of the fundamental rights guaranteed by the due process clause of the Fourteenth Amendment, and that in such a case, where the defendant is unable to employ counsel, it is the duty of the court, whether requested or not, to assign counsel for him, and the attorney, as an officer of the court, is bound to serve. The authorities generally say that if a person is defended at the public cost, he must accept the services of any reputable attorney appointed by the court; however, if the accused is not dependent on the court, it is his right to have counsel of his own selection. McCleary v. State, 122 Md. 394, 400, 89 A. 1100; People v. Barnes, 270 Ill. 574, 579, 110 N. E. 881; Baker v. State, 86 Wis. 474, 56 N. W. 1088; 8 R. C. L. 84; 16 C. J. 823.

There is no authority for the proposition that a defendant without financial means should be compelled to accept counsel appointed for him by the court, and should be denied the right to avail himself of voluntary services offered by an independent organization. The reasons which underlie the right of the accused to counsel of his own selection, when he is able to compensate them from his own resources, apply equally as well when counsel is supplied from some other source, independent of the court. In either case, the accused should have the right to choose his defender. The importance of such a choice is illustrated in the present case when it is remembered that counsel assigned the prisoner by the court thought it unnecessary or unwise to raise the points upon which the voluntary counsel twice secured a reversal in the Court of Appeals of Maryland. Moreover, the accused is entitled to the advice and protection of counsel as soon as the occasion for it

arises. If it were necessary first to determine by litigation the purposes inspiring the offer of assistance, long delays might well ensue before the question could be decided, and, in the meantime, the accused would be deprived of legal advice, and a speedy trial, which is equally desirable for the prosecution as well as the defense, would ofttimes be prevented.

■■ While the absolute right to control a needy prisoner in the acceptance of volunteer counsel ought not to be lodged in the court, it is right and proper that the court should be notified and consulted by the volunteer. Since the court is charged with the duty, in capital cases at least, of providing counsel, it is entitled to know that outside aid is available; and in any event, a prudent lawyer, eager to uphold the canons of professional ethics, will avoid the appearance of improper solicitation of business for gain. A precise rule of procedure to fit all cases cannot be laid down. Indeed, the situation is itself exceptional, but there is no real difficulty in so handling it as to preserve the right of the prisoner to accept or reject the tendered aid without offense or lack of proper respect to the court. Circumstances may, of course, be imagined in which the proposed activities of counsel, or of the association employing him, are so manifestly improper that the court would be justified in forbidding participation in the case; but, ordinarily, the right of the prisoner to counsel and of the court to protect the administration of justice may both be served without passing upon the motives beneath the offer. The court can control counsel in his subsequent conduct of the case, and, if he offends, either by lack of proper respect for the court, or by subordinating the interest of his client to the interests of the organization employing him, the remedy of proper discipline is in the hands of the court. In short, the right of an attorney to volunteer his services should be limited to exceptional cases of the character indicated and the propriety of the attorney's action should be judged not by his motives but by his conduct in the trial of the case, if the defendant accepts his aid.

■ In the Lee case, an unsuccessful effort was made to see the prisoner at the jail, followed by a demand upon the state's attorney for permission to see the prisoner, an application for writ of habeas corpus in Baltimore City, where the prisoner was located, and finally an application to the circuit court of the county, in consequence of which, the offer of assistance was accepted. During the subsequent trial of the case, counsel constant-ly demanded the constitutional rights of the prisoner, and there is no evidence that counsel failed in his duty to his client, or, in violation of Canon 35 of the Code of Ethics, permitted the interests of the association to interfere therewith. The evidence fails to sustain the first charge that the respondent improperly injected himself in the Lee case, with knowledge of his guilt and contrary to Lee's desire.

■ There is no substance in the third charge in the Lee case that before the trial, Ades falsely represented himself as the sole attorney for Lee, although he knew that the circuit court for Worcester county had appointed able counsel to represent Lee. The charge is based on the allegation in the petition filed by Ades on November 16, 1931, in the Baltimore City court, to secure a writ of mandamus against the warden of the Baltimore City jail, directing him to permit the petitioner to have access to Lee. The statement is made therein that Ades had been retained as sole counsel for Lee, and in support thereof a photostatic copy of the written retainer signed by Lee was filed. Ades had also forwarded a copy to the circuit court for Worcester county. There was no mention in the petition for the writ that counsel had also been appointed by the court, but this fact was well known to the judge of the Baltimore City court, since after conference with Ades he had sent the deputy state's attorney to the jail to interview the prisoner and the various statements signed by Lee, referring to Wailes and Ades, had been secured and submitted to the judge. The allegation complained of was a statement of the petitioner's theory of his rights rather than a complete recital of all the facts, and it was obviously not intended to deceive the court. Two days later, Ades was in fact accepted as the sole counsel for the prisoner.

■ The kindred charges which relate to the attempt of Ades to become defendant's counsel in the cases of George Davis and Page Jupiter may be considered in the light of this discussion. In the former, the accusation is that Ades falsely represented that he had been engaged by George Davis to act for him, although Ades knew that Davis had previously stated in writing that he did not desire Ades but was satisfied with other counsel appointed to defend him by the circuit court of Kent county. Davis, a colored man, was charged with the commission of the crime of attempted rape upon a white woman on November 21, 1931, in Kent county. He was arrested in Wilmington, Del., on November

23d, and taken to the jail at Easton, Md. On November 24th he was brought to Baltimore and lodged in the Baltimore City jail in order to prevent a possible lynching. On November 25th, Ades was employed by Berger, the local secretary of the International Labor Defense, and endeavored to see Davis at the jail, but was refused admission. On November 28th, R. Hynson Rogers and J. H. C. May, prominent lawyers of Kent county, were assigned to defend the accused by the circuit court of the county, and on December 1st, Davis wrote to the judges of the court and thanked them for their action. On December 3d, Ades applied to a judge of the supreme bench of Baltimore City for a writ of habeas corpus to enable him to see the prisoner, and the judge sent to the jail a deputy state's attorney who brought back a signed statement from Davis that he wanted the lawyers appointed by the court and did not want to see anybody else. On December 5th, a letter written by Davis was smuggled out of the jail through another prisoner. It was addressed to Ades and stated that Davis wanted him to take his case and did not want the lawyers that had been given him by the court. On December 8th, Ades sent to the clerk of the circuit court for Kent county an order to enter his appearance for the defendant in the case, and stated therein that the defendant had employed him as his sole attorney and did not accept the services of any attorney appointed by the court. It is this paper which is the basis of the charge against Ades. On the same day that it was filed, the attorneys appointed by the court visited the jail and Davis signed another statement to the effect that he did not want Ades for his lawyer but only the lawyers appointed by the court, and that he was sorry that he had written the letter to Ades but had been influenced to do so by certain disreputable elements in the jail that frightened him into writing it. On December 9th, the Baltimore City court issued a writ of habeas corpus, and when this came on to be heard on December 11th, Davis, in the presence of the several lawyers, adhered to his prior determination to be defended by the lawyers appointed by the county court and the writ of habeas corpus was dismissed. In view of the letter of December 5th sent by Davis to Ades, it is obvious that the charge against him in this respect has not been sustained.

■ The Page Jupiter case occurred in 1933. It is charged that on July 20, 1933, Ades obtained a writ of habeas corpus from a member of the supreme bench of Baltimore City for the production of Jupiter, although he had not been engaged as counsel by Jupiter, or by any one authorized to act in his behalf, and without disclosing this fact to the judge. In July, 1933, Jupiter was charged with the murder of a white woman in Charles county. He was arrested and confined in jail at LaPlata, but was brought to Baltimore on July 10th for safe-keeping, a few minutes before a mob attacked and entered the jail at LaPlata and made a search for the prisoner with the special intent to lynch him. An investigation was made of the case by lawyers employed by the National Association for the Advancement of Colored People on July 12th and 13th. Later, William N. Jones, an official of the Afro American newspaper, became interested in the case because of the attempted lynching, but he did not know of the investigation that had been made. He employed Ades to investigate the case and the latter secured a writ of habeas corpus before a judge of the supreme bench of Baltimore City on July 18th. No evidence was offered in the present proceeding to indicate whether or not Ades disclosed to the judge that he had not been engaged as counsel by Jupiter, but was merely seeking an opportunity to investigate the case and offered his assistance.

■ It should be added, with respect to the efforts of Ades to interview Davis and Jupiter, and voluntarily to act as counsel in their defense, that no effort had been made by any court to punish him for the similar action which he had taken in the case of Euel Lee. No proceedings against him were instituted by either the state or city bar associations, or by the judges of any of the courts. Except in so far as the judge of the circuit court for Worcester county was quoted in the newspapers of November 5, 1931, as saying that no lawyer for the International Labor Defense had any standing in his court, Ades had not been rebuked by the courts for volunteering his services and no formal action had been taken against him. Under these circumstances, the tender of services in the subsequent cases should not be the subject of punitive action by the court. However, it should be noted in passing that Ades was not needed in either of these cases; and it should be said, lest a wrong conclusion be drawn from this discussion, that repeated attempts on the part of an attorney to volunteer his services, even in needy cases, will be looked upon askance by the legal profession, and will likely lead to a critical examination of the attorney's conduct.

■ We have still to deal with the charges of unprofessional conduct which relate to

Ades' actions in the Lee case after he had been accepted as counsel, and with certain critical statements made by him against state judges and officials. The most serious of these charges is that he attempted to intimidate the witness, Martha Miller, and get her to commit perjury. The evidence does not sustain this charge. It is not intended to approve his conduct in causing this witness to be brought to his office in Baltimore to be questioned. On the contrary, it was ill-advised and dangerous in the extreme in view of the sense of outrage which a terrible crime had naturally aroused in the hearts of the people. All of this had been intensified by the public announcement that the prisoner had confessed and by the interposition in the case of an organization obnoxious to the thought and feeling of a conservative community. We cannot condone the personal violence to which Ades was subjected in Snow Hill, or the wrecking of his automobile, or the failure of the authorities to prosecute these offenses; but it must be recognized that they followed an apparent attempt to tamper with an important witness for the state. It was the right of defendant's counsel to ascertain in an appropriate way the evidence against the prisoner, and this might have been done in this case by interviewing the witness, with the knowledge and consent of the prosecuting authorities. The evil consequences of the course pursued have culminated in this most serious charge against the respondent; and if it were sustained, he should not only be forever barred from practice in the courts, but he should be prosecuted criminally. The evidence, however, does not show an attempt to corrupt the witness, but at most a searching examination to ascertain the extent of her knowledge, and an effort to induce her not to say that Lee had brought property of the Davis family to her house, but to confine her testimony, in accordance with the fact, to the statement that the goods had been found in his room. At one point in the pending inquiry Martha Miller testified that Ades had suggested that she might be a little lenient to Lee since they were of the same color and that as she was poor, it would be beneficial to her to do so. But she made no mention of this circumstance in her statement given to the officers of the law after leaving Ades' office on the night of the interview, or in her testimony at either of the jury trials; and Ades, on his part, has testified that he offered her no inducement to change her story. It is significant that the authorities of Dorchester county failed to take any action against the respondent in the premises. Martha Miller was picked up by the police a short time after she left the respondent's office, and her story of what happened was immediately taken down. The next day in Snow Hill the investigator of Ades was arrested for carrying concealed weapons, and he himself was put out of the case by the judges of the court, and subjected to personal violence on the streets of the city. Thereafter, he was refused participation in the case until reinstated as counsel by the decree of the Baltimore City court on November 18th. It seems altogether likely that the county authorities, resenting as they did his entrance into the case, would have taken some action against him in the interval, if they were in possession of information to justify it.

There is no proof to sustain the second charge in the Page Jupiter case that at the hearing on the writ of habeas corpus on July 21, 1933, Ades falsely represented that permission had been refused any counsel to confer with Jupiter, although he knew that two attorneys had been previously allowed that opportunity. The uncontradicted evidence in the pending proceeding is to the effect that the authorities in Charles county had permitted a conference between the prisoner and lawyers seeking to aid him, but that this offer was not known to Ades until he learned of it at the hearing on the writ. This specific charge must therefore fail. Subsequent assertions by Ades of the denial to counsel of access to Jupiter will be hereinafter considered.

The respondent, however, has gone to such extremes of action and statement in some respects as to merit the condemnation of the court. After all of his efforts on behalf of Euel Lee had failed, he brought an action in the Baltimore City court against the warden of the Maryland penitentiary on the day after the execution had taken place in order to require the delivery of Lee's body to him. He filed with the papers in the case a will of the deceased, executed the day before his death, in which the deceased bequeathed his body to Ades. The latter testified that the idea of such a will had originated with him, and that it was his purpose to take the body to New York City for a memorial service to be held in Harlem under the auspices of the International Labor Defense so as to show that Euel Lee was in fact innocent and that in his case there had been a "legal lynching" by the officials of Maryland; that the purpose was not to stir up race prejudice, but to show that the state of Maryland oppresses the colored race and does not recognize their legal

rights. It was also brought out that Ades did not tell Lee of the intended disposition of his body, and that after signing the will, Lee also signed a statement requesting that the chaplain of the penitentiary have charge of his body after death and had expressed a desire that there be no spectacle made either of his death or of his funeral. The petition in this case was dismissed after hearing, and Ades himself was enjoined from interfering with the body, the judge holding that the will was void since Ades had abused the confidential relationship between him and his client by making himself the beneficiary, without disclosing the purpose which he had in mind. It follows that this charge against the respondent has been substantially proved. His conduct was not merely offensive to every instinct of good taste. It was to a high degree reprehensible in that he withheld from Lee the real purpose that he had in mind in obtaining the body, and that he proposed to stigmatize as unfair, a judicial proceeding in which a formal conviction had been sustained only after the case had been thrice reviewed by the highest court of the state. He was saved from carrying this purpose into effect only by the decisive action of Judge O'Dunne. In the case of In re Hilton, 48 Utah, 172, 158 P. 691, Ann. Cas. 1918A, 271, an attorney was disbarred who published a number of abusive statements, culminating in a funeral oration over the body of his client convicted of murder, in which "judicial murder" and "assassination" and subservience to the Mormon Church was charged.

▇ Finally, there is the general charge that from time to time Ades published false statements embodying criticism of certain judges and other officials of the state of Maryland. This charge is proved by the respondent's action in the Page Jupiter case. Learning, during the hearing of the habeas corpus proceeding in this case, that access to the prisoner had been accorded to Charles H. Houston, leading counsel for Ades in the pending case, and to Edward P. Lovett, also an attorney, Ades, after the hearing, communicated with Houston and was told the true situation. Houston and Lovett had sought an interview with Jupiter in Charles county, as attorneys for the National Association for the Advancement of Colored People, and had been refused permission by the chief judge of the circuit until they had secured a request from one of Jupiter's family that they be permitted to see him. Such a request was obtained, and on July 13, 1933, the judge authorized and directed the warden of the Baltimore City jail to permit the lawyers to have access to Jupi-

ter for the purpose of interviewing and consulting with him in reference to his defense. The prisoner was in fact interviewed, and the attorneys satisfied themselves that all of his rights were being fully protected, including the inclusion on the jury panel of persons of the colored race; and the attorneys made a formal report to this effect to the association which thereafter took no further action in the matter.

Thus it became clear to Ades that a notice filed by him with the state's attorney of Baltimore City on July 18th, informing him of the point to be raised in the habeas corpus proceedings in the Jupiter case, contained grossly unfair and incorrect statements. This paper referred to the arrest and confinement of Jupiter on the charge of murder, to a confession first made and then repudiated by him, and to the attempt of a mob organized in Charles county to lynch him, including a search of the jail. It charged that no indictment against the members of the mob had been secured, and that unless Jupiter could be assisted in obtaining counsel of his own selection, he would be arraigned in the county where mobs had been organized against him, and would be represented by a lawyer appointed by the circuit court of the county who would doubtless be a leading citizen, but also a member of that class of leading citizens in the county that had suffered lynch mobs to be formed against Jupiter, without any action being taken for their arrest or punishment. Then followed the slanderous statement that the writ was sued out to ascertain whether or not the courts of Baltimore City would interfere with this attempt on the part of officials of Charles county to railroad to his death a member of an oppressed national group then within the jurisdiction of the city of Baltimore.

The state's attorney of Baltimore City on July 23, 1933, after the conclusion and dismissal of the habeas corpus case, filed charges against Ades with the president of the Maryland state bar association, consisting of a copy of the paper above mentioned, and drawing particular attention to the concluding statement therein, and to the facts relative to the visit of the attorneys of the Association for the Advancement of Colored People and their commendatory report. The state's attorney also gave out to the newspapers a copy of the letter in which the charges were preferred. On July 24, 1933, Ades gave out a statement to the press in which he disclaimed any intention to criticize the chief judge of the circuit, but admitted that he did

refer to the sheriff of Charles county and to all other officials who assisted him "in his attempt to railroad Page Jupiter," and he declared that he was being attacked by the state's attorney because he had exposed in the Jupiter and other previous cases, the lynch law tactics of Maryland officials. The newspapers carried so much of this statement as indicated that Ades had charged that the officials of Charles county were attempting to railroad Page Jupiter to his death. There was no justification for this scandalous attack upon the county officials. Ades may have felt some indignation at the failure to institute proceedings against the members of the mob who had searched the jail in Charles county in order to find and lynch Page Jupiter; but he knew full well that leading members of Jupiter's race had found that the officials of Charles county were according to Jupiter every constitutional right and opportunity for a fair trial. In spite of this knowledge, he, in effect, republished the charge, excepting only the chief judge of the circuit. The only thing that can be said in his behalf in this respect is that at the trial of the pending case he admitted that he had done wrong. As yet he had made no other effort, public or private, to retract the false charges which he uttered.

 One of the fundamental duties of a lawyer, as an officer of the court, is to maintain a proper respect for the courts of justice and judicial officers. This duty, which is enjoined by the first canon of professional ethics of the American bar association, found early recognition in Bradley v. Fisher, 13 Wall. 335, 355, 20 L. Ed. 646, where the Supreme Court of the United States said: "But * * * the obligation which attorneys impliedly assume, if they do not by express declaration take upon themselves, when they are admitted to the bar, is not merely to be obedient to the Constitution and laws, but to maintain at all times the respect due to courts of justice and judicial officers. This obligation is not discharged by merely observing the rules of courteous demeanor in open court, but it includes abstaining out of court from all insulting language and offensive conduct toward the judges personally for their judicial acts."

An attorney does not surrender, in assuming the important place accorded to him in the administration of justice, his right as a citizen to criticize the decisions of the courts in a fair and respectful manner, and the independence of the bar, as well as of the judiciary, has always been encouraged by the courts. But the right of fair criticism does not carry with it a liberty to indulge in false and malicious assault upon the integrity of the courts, or to charge a court or judge with corruption, willful partiality, or sinister motives in the trial and decision of cases. Such conduct, whether during the course of litigation or thereafter, is not only a gross violation of the duty of respect to the courts, but, if permitted to go unrebuked, would tend inevitably to bring the courts and our whole system of administering justice into public disrepute. It has rightly been condemned by all courts that have had occasion to pass upon the question, and has generally been regarded as a ground for suspension or disbarment. Thatcher v. U. S. (C. C. A.) 212 F. 801; United States v. Green (C. C.) 85 F. 857; In re Thatcher, 80 Ohio St. 492, 663, 89 N. E. 39; State v. Breckenridge, 126 Okl. 86, 258 P. 744, 53 A. L. R. 1239; In re Hilton, 48 Utah, 172, 158 P. 691, Ann. Cas. 1918A, 271; People v. Metzen, 291 Ill. 55, 125 N. E. 734; People v. Standidge, 333 Ill. 361, 164 N. E. 844; In re Dunn, 85 Neb. 606, 124 N. W. 120, 130; In re Troy, 43 R. I. 279, 111 A. 723; Matter of Rockmore, 127 App. Div. 499, 111 N. Y. S. 879; Scouten's Appeal, 186 Pa. 270, 40 A. 481; and see further authorities, 53 A. L. R. 1244.

 Reviewing the whole case, it may not be said that the respondent's conduct throughout was wholly wrong. He has to his credit that actions of the trial court detrimental to the defendant in the Lee case were corrected, because they were regarded as improper, not merely by him or by the organization which employed him, but by the Court of Appeals of Maryland. This phase of his activities led one of the counsel opposed to him in the pending matter to say frankly in argument that the respondent had rendered a public service which, without him, would have been left undone. Still he is not free from serious breach of the standards which a lawyer must maintain. He made himself deliberately offensive to counsel appointed by the circuit court for Worcester county to serve with him in the Lee case, and to that court itself in the manner in which he spoke of it in his letter to Mr. Wailes. The bitterness and unfairness of his attack upon the other courts concerned in the Lee and Jupiter cases have just been described. He has seemed to be incapable of the very tolerance and sense of fair dealing which he declares is sometimes lacking in the institutions he attacks. The proper disciplinary action must be determined in view of the whole case. It does not seem to the court that the extreme punishment of disbarment should be inflicted. Much that

is blameworthy in the respondent's conduct carries its own antidote, for no one can succeed at the bar who comports himself as he has done. Taking into consideration the unquestioned service rendered in the Lee case, the injuries which the respondent suffered at the hands of lawless men while acting as counsel in that case, and the fact that he has already suffered a suspension from the bar of this court for approximately five months, it is believed that a public reprimand will suffice. This will be the judgment of the court.